IN the INTEREST OF TIFFANY NICOLE M., a person Under the Age of 18:

STATE of Wisconsin, Petitioner-Respondent,

v.

ALLEN M., Respondent-Appellant,†

PATRICIA A.M., a/k/a Patty A.T., Respondent-Co-Appellant.†

Court of Appeals

*No. 97–0852. Oral argument September 9, 1997.—Decided October 21, 1997.*

(Also reported in 571 N.W.2d 872.)

†Petition to review denied.

On behalf of the respondent-appellant, the cause was submitted on the briefs of *Ellen Henak,* assistant state public defender. There was oral argument by *Ellen Henak.*

On behalf of the respondent-co-appellant, the cause was submitted on the briefs of *James M. Weber,* of Milwaukee. There was oral argument by *James M. Weber.*

On behalf of the petitioner-respondent, the cause was submitted on the briefs of *James Doyle,* attorney general, and *Diane M. Nicks,* assistant attorney general, and *Phyllis DeCarvalho,* assistant district

attorney. There was oral argument by *Diane M. Nicks* and *Phyllis DeCarvalho*.

On behalf of the petitioner-respondent, Tiffany N.M., a brief was submitted by guardian ad litem *Anne Marie Abell*, of the *Legal Aid Society of Milw., Inc.*, of Wauwatosa. There was oral argument by *Anne Marie Abell*.

Before Wedemeyer, P.J., Fine and Schudson, JJ.

SCHUDSON, J.[1] Patricia A.M., a/k/a Patty A.T., and Allen M. appeal from the trial court order terminating their parental rights to Tiffany N.M. The trial court found that their incestuous parenthood of Tiffany constituted "unfitness," pursuant to §§ 48.415(7) and 48.424(4), STATS.,[2] and ultimately concluded that ter-

---

[1] This appeal was originally a one-judge appeal under § 752.31(2), STATS. It was converted to a three-judge panel by order of Chief Judge William Eich on June 9, 1997. *See* RULE 809.41(3), STATS. This appeal has been "given preference," *see* § 809.107(6)(e), STATS., to ensure a prompt decision. This court has, however, extended the deadline for decision to enable the Attorney General to submit a brief and to provide all parties the opportunity to present oral argument. *See* RULE 809.82(2)(a), STATS.; *see also Winnebago County DSS v. Darrell A.*, 194 Wis. 2d 627, 534 N.W.2d 907 (Ct. App. 1995) (court of appeals did not lose competency to proceed in termination of parental rights case although appellate decision issued after deadline of § 809.107, STATS. (1993–94)).

[2] The petition for termination was drafted pursuant to § 48.415(7), STATS. (1993–94). Section 48.415(7), STATS. (1993–94), provided that "[i]ncestuous parenthood may be established by a showing that the person whose parental rights are sought to be terminated is also related, either by blood or adoption, to the child's other parent in a degree of kinship closer than 2nd cousin." Subsection (7) was amended to provide:

mination was appropriate, under § 48.427, STATS.[3] Patty and Allen argue that § 48.415(7) violates their constitutional rights of due process and equal protection. We reject their arguments and affirm.

## I. BACKGROUND

The factual background is undisputed. Tiffany was born on September 5, 1990, to Patty and Allen, who are biological siblings. Tiffany is the second of three children Patty and Allen have produced through their incestuous relationship.

"[i]ncestuous parenthood, *which shall be established by proving that the person* whose parental rights are sought to be terminated is also related, either by blood or adoption, to the child's other parent in a degree of kinship closer than 2nd cousin." *See* 1995 Wis. Act. 275, § 85 (emphasis added). Its effective date was July 1, 1996. Although the record does not reflect that the State amended the petition to reflect this change, the appellants cite the amended subsection as the statutory basis for the termination of Patty's and Allen's parental rights. Therefore, we base our analysis on the 1995–96 statutes, and all further statutory references are to the 1995–96 Wisconsin Statutes.

[3] Section 48.427, in part, provides:

**48.427 Dispositions. (1)** Any party may present evidence relevant to the issue of disposition, including expert testimony, and may make alternative dispositional recommendations to the court. After receiving any evidence related to the disposition, the court shall enter one of the dispositions specified under subs. (2) to (4) within 10 days.

**(2)** The court may dismiss the petition if it finds that the evidence does not warrant the termination of parent rights.

**(3)** The court may enter an order terminating the parental rights of one or both parents.

. . . .

**(4)** If the rights of one or both parents are terminated under sub. (3), the court may enter an order placing the child in sustaining care under s. 48.428.

On March 31, 1994, Tiffany was removed from her parental home and placed in foster care because Patty and Allen had abandoned her at the home of a baby-sitter. Tiffany had become sick while in the sitter's care and needed to see a doctor; her parents could not be found. Consequently, after the sitter contacted the authorities, Tiffany was taken into the custody of the Milwaukee County Department of Human Services.

On March 8, 1995, the juvenile court found Tiffany to be a Child in Need of Protection or Services, pursuant to § 48.13(10), STATS.[4] The court entered a dispositional order placing Tiffany outside her parents' home for one year and setting conditions for Tiffany's return to them. On April 1, 1996, the State filed a petition to terminate Patty's and Allen's parental rights to Tiffany on the ground of their incestuous parenthood.[5]

---

[4] Section 48.13(10), STATS., in part, provides:

**48.13 Jurisdiction over children alleged to be in need of protection or services.** The court has exclusive original jurisdiction over a child alleged to be in need of protection or services which can be ordered by the court, and:

. . . .

**(10)** Whose parent, . . . neglects, refuses or is unable for reasons other than poverty to provide necessary care, food, clothing, medical or dental care or shelter so as to seriously endanger the physical health of the child.

[5] We note the difference between the grounds for the CHIPS petition and the grounds for termination. Neither Allen nor Patty, however, raises any issue based on that disparity. *See State v. Patricia A.P.*, 195 Wis. 2d 855, 537 N.W.2d 47 (Ct. App. 1995) (termination denied due process where grounds did not correspond to those about which parent had been warned in underlying CHIPS order). *But see Darrell A.*, 194 Wis. 2d at 645, 534 N.W.2d at 914 (No need for notice under § 48.356, STATS.,

A trial to the court was held on August 29, 1996. In the first phase, the fact-finding hearing under § 48.424, STATS., the State established that Patty and Allen are biological siblings and that Tiffany is their biological daughter. Neither Patty nor Allen contested the evidence of their incestuous parenthood of Tiffany and, consequently, the trial court found Patty and Allen unfit and proceeded to the dispositional phase under § 48.427(2), STATS.

During the dispositional phase, Dr. David Tick, a former professor of genetics at the Milwaukee County Medical College, testified about Tiffany's profound development delays, her psychosocial deprivation,[6] and her stunted physical development. He testified based not only on his two examinations of Tiffany, but

where notice would be superfluous due to impossibility of remedying circumstances leading to termination.).

[6] As described by Dr. Tick:

Psychosocial deprivation is a term used to connotate a failure in growth; growth in stature, growth in weight, growth in head circumference, which is usually concomitant with significant global developmental disorders . . . associated with an absence of identifiable medical factors which could give rise to such constellation of findings.

What sorts of medical factors might that be? Children who are born with severe congenital heart problems, children who are born with severe gastrointestinal disturbances, children who are born with chromosomal abnormality such as Down's syndrome may all fairly be expected because of their medical diagnosis to grow at rates different and less than that . . . normally seen in other children, and also may have other developmental progress which is less than what is seen in other children.

In the absence of data suggesting the presence of such a disorder . . . if there is also evidence to suggest that the child's psychosocial surroundings are in some way detrimental, or inadequate, or neglectful, or abusive, it is a well-recognized phenomenon that those sorts of problems alone are sufficient when present in an extreme to cause the sorts of changes that we're talking about.

also on the medical reports prepared by Dr. June Dobbs, who had examined Tiffany on two previous occasions–shortly after her removal from the parental home, and three months later. Dr. Tick explained that when Dr. Dobbs first examined Tiffany, she was a non-verbal, three and one-half year old who behaved and physically appeared more like a two-year-old child. She was not toilet trained or able to feed herself and she displayed little or no emotion. Dr. Tick testified, however, that after time with her foster family, Tiffany made great progress. Thus, he concluded that Tiffany's delays resulted, in significant part, from parental neglect.

Dr. Tick also testified that he had diagnosed Tiffany with an autosomal recessive disorder.[7] On cross-examination, defense counsel referred to a letter addressed to the judge who presided over the CHIPS proceeding, in which Dr. Tick concluded:

> that Tiffany M[.] does not appear likely to be the victim of a genetically mediated disease, that further genetic evaluation and/or testing is probably unwarranted and would be unlikely to disclose any new or useful information, and that the most likely diagnosis is psychological deprivation.

Dr. Tick explained, however, that he had written that letter, based solely on Dr. Dobbs's findings, one month

---

[7] Dr. Tick explained:

[A]ny time a child is born as a product of an incestuous relationship there is a likelihood, a possibility that the child could be born with a disorder related to the genetics involved in that mating.

That is to say that a recessive gene may be present in both of the parents that can be transmitted to the child, and therefore the child has a likelihood of being born with an autosomal recessive syndromic disorder.

before his first examination of Tiffany. He stated that after examining Tiffany, his opinion changed. Dr. Tick then clarified that although he believed "the lion's share" of Tiffany's developmental disabilities resulted from psychosocial deprivation, her parents' consanguinity, and its concomitant effects, might also have contributed to her developmental problems.[8]

Cynthia Barczak, a psychotherapist who worked with Tiffany and Patty, also testified at the dispositional hearing. She described Tiffany as a child with dramatic special needs who would require extensive therapy. Barczak testified that Patty had great difficulty recognizing Tiffany's problems and was unable to help Tiffany master basic skills such as identifying colors or counting. Barczak concluded that Patty and Tiffany had not bonded, that Allen and Tiffany had no substantial relationship, and that nothing positive would come from a continuing relationship between Tiffany and her biological parents.

Mary Dirk, a Milwaukee County Department of Human Services social worker, also testified. She told the court that Patty had two daughters prior to Tiffany, one of whom was also fathered by Allen. Parental rights to that child were involuntarily terminated in

---

[8] Whether consanguineous mating causes genetic defects may be more questionable than generally assumed. *See* Carolyn S. Bratt, *Incest Statutes and the Fundamental Right of Marriage: Is Oedipus Free to Marry?*, 18 FAM. L.Q. 257, 267–81 (1984) ("The primary misconception underlying the asserted hereditary-biological function of incest statutes is the belief that consanguineous mating causes genetically defective offspring. A cursory examination of . . . autosomal dominant and recessive inheritance reveals that such a belief is simply inaccurate.").

Texas in 1989.[9] Dirk also testified that Allen had been very uncooperative with the clinicians and social workers who were evaluating him and trying to assist him in meeting the CHIPS conditions for Tiffany's return. She stated that Patty had been more cooperative than Allen, but was still unable to comply with the conditions. Lastly, Dirk apprised the court that Patty had recently given birth to a baby boy, whom she believed was also fathered by Allen.[10]

The trial court found:

> [P]ursuant to sec. 48.426,[11] there is a great likelihood of adoption of the child, in that an adoptive home had been identified by MCDHS as an appro-

[9] Subsequent to oral argument, the parties submitted a stipulation stating, in part:

> Attached . . . is a copy of the Decree of Termination entered on April 18, 1989 in Taylor County, Texas, regarding the [involuntary termination of Patty's and Allen's parental rights to] . . . Christina M., the older sibling of Tiffany N.M.

> [A]ll counsel agree that Wis. Stat. Sec. 48.415(10) [providing that grounds for termination include a prior involuntary termination of parental rights to another child within three years of the CHIPS adjudication for the child who is the subject of the current termination action] does not provide an alternative ground for termination of the parental rights of Patty A.M. and Allen M. in view of the fact that the Decree of Termination for Christina M. was entered more than three years prior to the entry of the CHIPS dispositional order for Tiffany N.M.

[10] Dirk also testified that Patty and Allen were abused and neglected as children, and were in and out of foster care throughout their childhoods. She described the cycle of sexual abuse in Patty and Allen's childhood home and referred to Milwaukee County social services' records detailing a history of incest among several of the fourteen children in Patty and Allen's immediate family.

[11] Section 48.426, STATS., provides:

311

priate adoptive resource. The court further finds that there is no relationship between the child and her respective parents or extended family members which would be harmed; to the contrary, given the tenacity of dysfunction between Tiffany's parents who persist in maintaining an incestuous relationship which continues to produce children, the court finds that severance of all legal, emotional and physical ties with the extended . . . family is in the child's best interest. The court further finds that there are no obstacles to adoption regarding the child's age or health, and that adoption would provide the best chance for a stable and permanent home for the child.

**48.426 Standard and factors. (1)** COURT CONSIDERATIONS. In making a decision about the appropriate disposition under s. 48.427, the court shall consider the standard and factors enumerated in this section and any report submitted by an agency under s. 48.425.

**(2)** STANDARD. The best interests of the child shall be the prevailing factor considered by the court in determining the disposition of all proceedings under this subchapter.

**(3)** FACTORS. In considering the best interests of the child under this section the court shall consider but not be limited to the following:

(a) The likelihood of the child's adoption after termination.

(b) The age and health of the child, both at the time of the disposition and, if applicable, at the time the child was removed from the home.

(c) Whether the child has substantial relationships with the parent or other family members, and whether it would be harmful to the child to sever these relationships.

(d) The wishes of the child.

(e) The duration of the separation of the parent from the child.

(f) Whether the child will be able to enter into a more stable and permanent family relationship as a result of the termination, taking into account the conditions of the child's current placement, the likelihood of future placements and the results of prior placements.

(Footnote added.) Accordingly, the trial court concluded that Tiffany's best interests would be served by the termination of the parental rights of her biological parents.

## II. ANALYSIS

### A. Due Process

Patty and Allen argue that § 48.415(7), STATS., is unconstitutional and, therefore, the termination of their parental rights based on their incestuous parenthood of Tiffany denied them due process of law. In essence, they assert that even though the State has a compelling interest in preserving and promoting the welfare of children, a statute specifying incestuous parenthood as a ground for termination is not narrowly tailored to serve the State's interest. We disagree.

The constitutionality of a statute presents a question of law this court reviews *de novo. See State v. Post*, 197 Wis. 2d 279, 301, 541 N.W.2d 115, 121 (1995), *cert. denied*, 117 S. Ct. 2501 (1997). A party challenging the constitutionality of a statute bears a heavy burden of persuasion. *See Winnebago County DSS v. Darrell A.*, 194 Wis. 2d 627, 637 534 N.W.2d 907, 911 (Ct. App. 1995). The statute is presumed constitutional and the party challenging it must demonstrate its unconstitutionality beyond a reasonable doubt. *See id.* "Every presumption must be indulged to sustain the law if at all possible and, wherever doubt exists as to a legislative enactment's constitutionality, it must be resolved in favor of constitutionality." *Bachowski v. Salamone*, 139 Wis. 2d 397, 404, 407 N.W.2d 533, 536 (1987) (internal quotation marks and quoted source omitted). Further, as this court recently reiterated:

Strict judicial scrutiny is required when certain fundamental rights are affected by governmental action. [The appellant] correctly states that "a parental rights termination proceeding interferes with a fundamental right." The State's ability to deprive a person of the fundamental liberty to one's children must rest on a consideration that society has a compelling interest in such deprivation. Additionally, the infringement on such a liberty must be narrowly tailored to serve the compelling state interest.

*Darrell A.*, 194 Wis. 2d at 639, 534 N.W.2d at 911 (citation omitted).[12] We conclude that § 48.415(7), STATS., is a constitutional subsection of a statutory scheme that is narrowly tailored to serve the State's

[12] In their initial briefs to this court, the parties seemed to agree that because the statutory scheme infringes on the parents' fundamental right to provide parenting to their child, this court needed to evaluate the constitutionality of the statute under a strict scrutiny analysis. In subsequent briefs and oral argument, however, the assistant attorney general and the guardian ad litem maintained that because no court has ever recognized incestuous parenthood or the act of incest as a fundamental right, the statute need only meet the rational relationship test.

The Attorney General and guardian ad litem's argument is interesting. Indeed, very recently in *State v. Fisher,* 211 Wis. 2d 664, 565 N.W.2d 565 (Ct. App. 1997), this court rejected a defendant's challenge to the constitutionality of § 948.02(2), STATS., and his argument that its prohibition of consensual sexual relations with a child under age sixteen violated his right to privacy and procreation. We rejected as "fallacious" his contention that the statute must pass the strict scrutiny test.

Nevertheless, although intrigued by this argument, we need not directly address it because we conclude that, even under strict scrutiny analysis, § 48.415(7), STATS., is constitutional.

compelling interests in the welfare of children, preservation of family, and maintenance of an ordered society.

While "[t]he Due Process Clause requires a showing of justification when the government intrudes on choices concerning family living arrangements in a manner which is contrary to deeply rooted traditions," *Zablocki v. Redhail*, 434 U.S. 374, 399 (1978) (Powell, J., concurring) (internal quotation marks and quoted source omitted), there is no question that the "State may legitimately say that no one can marry his or her sibling." *Id.* (Stewart, J., concurring). This determination is consistent with, not contrary to, deeply rooted traditions.[13] Thus, no fundamental principle of justice is offended when a state determines that siblings, whom it can legitimately bar from marriage, are unfit to provide parenting for the children they produce through their non-marital, incestuous relationship.

Wisconsin's termination statutes vest considerable discretion in the trial court, thereby precluding the possibility that a proper application of § 48.415(7), Stats, would deprive a parent of due process rights. *See B.L.W. v. Polk County DSS*, 163 Wis. 2d 90, 115, 470 N.W.2d 914, 925 (1991) ("The discretion that the statute vests in the court to dismiss the petition for termination if it finds termination is not warranted under the standards assures full, substantive due pro-

---

[13] *See Bowers v. Hardwick*, 478 U.S. 186, 194 (1986) (declining to expand the fundamental rights protected by the Due Process Clause to include sodomy). As the Supreme Court emphasized, "[t]he law . . . is constantly based on notions of morality, and if all laws representing essentially moral choices are to be invalidated under the Due Process Clause, the courts will be very busy indeed." *Id.* at 196.

cess."). Even if grounds for termination exist and statutory unfitness is found, the trial court may dismiss the petition under § 48.427(2) if the dispositional evidence does not "warrant" termination. *See* § 48.426, STATS. As the supreme court explained:

> This means that even though the jury finds the "facts" that would constitute grounds for termination, the court may still dismiss the petition if the court finds either that the evidence does not sustain any one of the jury's individual findings or that even though the findings may be supported by the evidence, the evidence of unfitness is not so egregious as to warrant termination of parental rights. Thus, it is clear that in spite of what the evidence may show, whether such evidence warrants termination, is a matter within the discretion of the court. This is so because the word "warrant" [in § 48.427(2), STATS.] implies an overview of the evidence, the findings, and also the implication of what is in the best interest of the child.

*Id.* at 103–104, 470 N.W.2d at 920.

As prescribed by § 48.426, STATS.,[14] the trial court heard testimony regarding "the best interest of the child," and considered the required dispositional criteria. The evidence established Tiffany's substantial needs, her parents' inability to provide care, her significant improvement in the foster home and her adoptability. Consequently, the court concluded that the only appropriate disposition would be the termination of Patty's and Allen's parental rights to Tiffany. Clearly, § 48.415(7), STATS., in combination with the dispositional statutory protection provided by

---

[14] *See* footnote 12 *supra,* op. at 314.

§§ 48.426 and 48.427, STATS., afforded Allen and Patty due process of law.

## B. Equal Protection

Patty and Allen also argue that termination of their parental rights pursuant to § 48.415(7), STATS., violates their rights to equal protection of law. They contend that the State's only compelling interest is the prevention of genetic mutations, and that this interest lapses once the child is born. Additionally, they claim that their kinship has no effect on their ability to be good parents. We disagree.

Equal protection of the law is guaranteed by the Fourteenth Amendment to the United States Constitution and by Article I, section 1 of the Wisconsin Constitution.[15] *See Reginald D. v. State*, 193 Wis. 2d 299, 306–307, 533 N.W.2d 181, 184 (1995). In evaluating § 48.415(7), STATS., under the Equal Protection

---

[15] As the Wisconsin Supreme Court recently reiterated:

The Fourteenth Amendment to the United States Constitution provides "nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." The functional equivalent of this clause is found in Article I, sec. 1, of the Wisconsin Constitution: "All people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted, deriving their just powers from the consent of the governed." As noted in *State ex rel. Sonneborn v. Sylvester*, 26 Wis. 2d 43, 49–50, 132 N.W.2d 249, 252 (1965), even though Article I, sec. 1, is based on the Declaration of Independence, "there is no substantial difference" between its equal protection and due process protections and that of the Fourteenth Amendment.

*Reginald D. v. State*, 193 Wis. 2d 299, 306–307, 533 N.W.2d 181, 184 (1995).

Clause, "we must first determine what burden of justification the classification . . . must meet, by looking to the nature of the classification and the individual interests affected." *Zablocki*, 434 U.S. at 383 (quoting *Memorial Hosp. v. Maricopa County*, 415 U.S. 250, 253 (1974)). Because courts have long recognized the right to parent one's children as fundamental, *see Pierce v. Society of Sisters*, 268 U.S. 510 (1925); *Meyer v. Nebraska*, 262 U.S. 390 (1923) (recognizing the importance of the right to rear and educate one's children), a statutory classification that significantly interferes with this right must be examined under strict judicial scrutiny. *See Darrell A.*, 194 Wis. 2d at 640, 534 N.W.2d at 912. Under a strict scrutiny analysis, a statutory classification which significantly interferes with the exercise of a fundamental right "cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests." *Zablocki*, 434 U.S. at 388.

Patty and Allen argue that § 48.415(7), STATS., does not further the State's interest in the continuing welfare of its children because whatever genetic defect might have been caused by parental consanguinity has already taken place. Genetic mutation, however, is but one consequence of incest, and only one of many reasons why Wisconsin and other states have long prohibited incestuous marriage and criminalized incest.[16] "The crime [of incest] is also punished to pro-

---

[16] Incest has been a crime in Wisconsin since 1858, *see* § 944.06, STATS., and criminal prosecutions under the incest statute have been upheld. *See Porath v. State*, 90 Wis. 527, 63 N.W. 1061 (1895); *see also Hintz v. State*, 58 Wis. 493, 17 N.W. 639 (1883); and § 765.03, STATS. (prohibiting marriage between persons who are nearer of kin than second cousins). Moreover, recent challenges to incest statutes in other jurisdictions have

mote and protect family harmony, to protect children from the abuse of parental authority, and because society cannot function in an orderly manner when age distinctions, generations, sentiments and roles in family are in conflict." *State v. Kaiser*, 663 P.2d 839, 843 (Wash. Ct. App. 1983).[17]

been rejected. *See: Benton v. State*, 461 S.E.2d 202 (Ga. 1995) (holding that the prohibition against incest is rationally related to a legitimate governmental interest—the protection of children and of the family unit); *In the Interest of L.*, 888 S.W.2d 337 (Mo. Ct. App. 1994) (holding that father's undisputed acts of incest with his minor sisters involved children "in the family" within the meaning of statutory ground for termination of father's parental rights to his biological daughter); *State v. Buck*, 757 P.2d 861 (Or. Ct. App. 1988) (holding that incest statute is not violative of federal constitutional right to privacy); *State v. Kaiser*, 663 P.2d 839 (Wash. Ct. App. 1983) (holding that statute criminalizing incest is not violative of equal protection).

[17] As discussed by a Georgia Supreme Court justice:

The incest taboo is one of the most important human cultural developments. It is found in some form in all societies. This universal proscription restricts intercourse, and hence marriage, among close relatives. Being primarily cultural in origin, the taboo is neither instinctual nor biological, and it has very little to do with actual blood ties. This is evidenced by the fact that the taboo is often violated—people generally are incapable of violating their instincts—and because society condemned incest long before people knew of its genetic effects. Modern anthropologists and comparative sociologists claim that the significance of the incest taboo is twofold. First, the restriction forces family members to go outside their families to find sexual partners. Requiring people to pursue relationships outside family boundaries helps form important economic and political alliances and makes a large society possible. A second purpose for the taboo . . . is maintaining the stability of the family hierarchy by protecting young family members from exploitation by older family members in positions of authority, and by reducing the competition and jealous friction among family members.

As the Attorney General argues, a child raised by incestuous parents is a child raised in a home that mocks even the most rudimentary conception of family. A statute that declares incestuous parents unfit acknowledges the fundamentally disordered circumstances in which the child of an incestuous relationship will be raised. Moreover, it recognizes the vulnerability of the child and the compelling interest in protecting children from the psychological confusion and emotional damage they likely will suffer as a result of being born to and living within an incestuous family.

Therefore, we reject Patty's and Allen's argument that once a child is born, the State's compelling interest lapses. Not only does the State's compelling interest in the protection of that child continue, but the State's equally compelling interest in deterring additional incestuous parenthood, by those parents and others, remains. As one court explained in a termination case, "the [incestuous] parent by his actions has demonstrated that the natural, moral constraint of blood relationship has failed to prevent deviant conduct and thus cannot be relied upon to constrain similar conduct in the future." *In the Interest of L.*, 888 S.W.2d 337, 341 (Mo. Ct. App. 1994). Thus, § 48.415(7), STATS., further promotes the State's compelling interest in deterring incest by, in effect, warning those who might contemplate incest that if they produce a child, they will not necessarily be permitted to parent the child.

*Benton v. State*, 461 S.E.2d 202, 205 (Ga. 1995) (Sears, J., concurring) (citing RICHARD A. POSNER, SEX AND REASON (1992); RANDALL COLLINGS, SOCIOLOGY OF MARRIAGE AND THE FAMILY (1985).

Patty and Allen argue, however, that § 48.415(7), STATS., is overinclusive[18] because an incestuous parent may have come to be a parent under very sympathetic and innocent circumstances. As examples, they offer scenarios in which the parent is a victim of sexual assault, or both parents are unaware of their blood relationship. Although these arguments are powerful, they do not account for the impact of § 48.427(2), STATS., which saves § 48.415(7) from being overinclusive.

As already noted, under § 458.427(2), STATS., the trial court has discretion to dismiss any petition for termination of parental rights where incestuous parenthood does not warrant termination. Although incestuous parenthood results in a finding of unfitness, that finding does not necessarily result in termination. Termination is authorized only if: (1) incestuous parenthood is proven by clear and convincing evidence; (2) incestuous parenthood is shown to warrant termination; and (3) termination serves the child's best interests. *See generally B.L.W.*, 163 Wis. 2d at 115, 470 N.W.2d 914, 925. As the supreme court explained, "[t]he legislature has in effect put a 'spin' on the word 'unfit' by giving the court the discretion to dismiss a petition if the circuit court 'finds that the evidence does not warrant the termination of parental rights.' " *Id.* at

---

[18] In her briefs to this court, Patty argues that the statute is overbroad. The concept of overbreadth has not been applied outside the context of the First Amendment. *See Dog Fed'n of Wis., Inc. v. City of S. Milwaukee*, 178 Wis. 2d 353, 364, 504 N.W.2d 375, 380 (Ct. App. 1993) (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)). We infer from her argument, however, that Patty, like Allen, contends that the statute is overinclusive.

104, 470 N.W.2d at 920; *see also* § 48.427(2), STATS. The court elaborated:

> There are obviously degrees of unfitness and some "unfit" parents may be more or less unfit than others. It is the fact of degrees of unfitness that has caused the legislature to allow the court, in the exercise of discretion, to evaluate a "finding" of "unfitness" even though the grounds of termination may be found by a jury or the court itself.

*B.L.W.*, 163 Wis. 2d at 104, 470 N.W.2d at 920. In short, § 48.427(2), STATS., requires that once a trial court determines a parent's factual "unfitness," it must then evaluate the parent's actual fitness as it considers whether termination of parental rights is in the child's best interests under § 48.426(2), STATS. Thus, § 48.415(7), STATS., in combination with § 48.427(2), is not overinclusive.

Finally, Patty and Allen claim that the statutory scheme is underinclusive because it does not include other sex offenses such as bigamy, adultery, and prostitution, which might also lead to parenthood. We reject their claim.

■ Our supreme court has consistently refused to find legislation unconstitutional just because it is not all-encompassing. *See State v. Hanson*, 182 Wis. 2d 481, 488, 513 N.W.2d 700, 703 (Ct. App. 1993). "The problem of legislative classification is a perennial one, admitting of no doctrinaire definition. Evils in the same field may be of different dimensions and proportions, requiring different remedies." *Racine Steel Castings v. Hardy*, 144 Wis. 2d 553, 569, 426 N.W.2d 33, 39 (1988). The legislature may, in its discretion, select one aspect of a problem and provide a remedy

even while neglecting other serious aspects of a problem. *See id.* "In seeking to preserve, to the greatest extent possible, the judgment of the legislature," courts have recognized that "if the law presumably hits the evil, it is not to be overthrown because there are other instances to which it might have been applied." *Id.* at 573, 426 N.W.2d at 40 (internal quotation marks and quoted source omitted).

■

Addressing incest between persons who are nearer of kin than second cousins, the legislature narrowly tailored § 48.415(7), STATS., to achieve a desired goal. The existence of other "evil" does not render § 48.415(7) underinclusive. Thus, § 48.415(7), in combination with the dispositional statutory protections provided by §§ 48.426 and 48.427, STATS., did not deny Allen and Patty full protection.

*By the Court.*—Order affirmed.

FINE, J. *(concurring).* I agree that Allen M. and Patricia M. have not shown that § 48.415(7), STATS., is unconstitutional as to them. As I understand it, we leave for another day other possible scenarios not implicated by this case. Thus, for example, § 48.415(7) provides that it is a ground for termination of parental rights if the child's parents are "closer than 2nd cousin[s]" by "adoption." That is not the case here. There are also other scenarios that are not presented by this case. *See, e.g., In re May's Estate,* 114 N.E.2d 4, 6–7 (N.Y. 1953) (upholding for the purposes of the administration of a woman's estate, the validity of her marriage to her uncle "by the half blood" even though the marriage was incestuous under New York law because it was valid under a religious-practice excep-

tion to a similar ban on incestuous marriages in Rhode Island, where the parties were married).

I also believe it appropriate to explain why the legislature requires a concurrent, *ipso facto*, finding of parental unfitness whenever a jury (or judge sitting as a fact-finder) decides that grounds for termination exist (what the majority calls "factual unfitness"), and why a determination of what the majority calls "actual unfitness" at the time of the proceeding is nothing more than a factor used to determine whether termination is in the child's best interests.

Under the current statutory scheme, a finding that grounds for termination exist shifts the focus to whether termination is in the child's best interest. Stated another way, a finding that the parent is "unfit" under § 48.424(4), STATS., is sufficient to trigger the best-interest phase of the hearing—actual parental "unfitness" at the time of the proceeding is not a prerequisite to termination. Section 48.424(4) provides: "If grounds for the termination of parental rights are found by the court or jury, the court shall find the parent unfit."[1]

In *In the Interest of J.L.W.*, 102 Wis. 2d 118, 306 N.W.2d 46 (1981), the supreme court was faced with a constitutional challenge to the termination-of-parental rights statute as it then existed. The circuit court was then, as it is now, empowered but not required to terminate a person's parental rights if the statutory grounds for termination existed—essentially substantial and significant abandonment or neglect of the child (grounds similar to those now found in § 48.415(1) & (6), STATS.). *See J.L.W.*, 102 Wis. 2d at 130–131, 306 N.W.2d at 52–53. This was a two-step process: 1) the

---

[1] This provision was added by 1987 Wis. Act 383, § 16m.

fact-finder decided whether there were grounds to terminate; 2) the circuit court decided whether termination was appropriate. *J.L.W.* engrafted on the statute a third step not provided for by the legislature: the parent had to be "unfit"— *at the time of proceeding*. *Id.*, 102 Wis. 2d at 132–136, 136, 306 N.W.2d at 53–55, 55. As described by commentators, *J.L.W.* "overturned an order terminating an unwed mother's parental rights on the ground that the lower court had not made a specific finding that she was unfit, even though a finding of unfitness was not required under either Wisconsin statutes or case law at the time." Stephen W. Hayes & Michael J. Morse, *Adoption and Termination Proceedings in Wisconsin: Straining the Wisdom of Solomon*, 66 MARQ. L. REV. 439, 474 (1983).[2]

Under the current statutory scheme, termination is also a two-step process: 1) the fact-finder decides whether there are grounds to terminate, § 48.424(1),

---

[2] The supreme court made it clear that the unfitness was to be gauged at the time of the proceeding by its use of the present tense "is": "We hold that, except under unusual circumstances like those presented in *Quilloin* [*v. Walcott*, 405 U.S. 645 (1972)], the due process protections of the State and Federal Constitutions prohibit the termination of a natural parent's rights, unless the parent *is* unfit." *In the Interest of J.L.W.*, 102 Wis. 2d 118, 136, 306 N.W.2d 46, 55 (1981) (emphasis added). Moreover, a parent found to have abandoned or neglected his or her child is obviously an "unfit" parent at the time of the abandonment or neglect, and an additional finding of unfitness would be unnecessary if it was to be an assessment of the parent's past behavior with respect to the child. *See also R.D.K. v. Sheboygan Cty. Social Services Dept.*, 105 Wis. 2d 91, 102, 312 N.W.2d 840, 846 (Ct. App. 1981) ("It is evident, then, that a finding of unfitness is a determination that *further* contact between parent and child will be seriously detrimental to the child.") (Interpreting *J.L.W.*; emphasis added.).

STATS.; and 2) the circuit court decides whether termination is appropriate, § 48.427(2). As in the statute considered by *J.L.W.*, the current provision, § 48.426(2), STATS., provides that "[t]he best interests of the child shall be the prevailing factor considered by the court in determining" whether termination of parental rights is appropriate. *See J.L.W.*, 102 Wis. 2d at 131, 306 N.W.2d at 52.

The third step engrafted by *J.L.W.* (parental unfitness at the time of proceeding) has been trumped by the simple expedient of legislatively directing the trial court to "find the parent unfit" if the fact-finder determines that any of the grounds for termination exist. Section 48.424(4), STATS. In *B.L.J. v. Polk County Dept. of Social Services*, 163 Wis. 2d 90, 470 N.W.2d 914 (1991), the supreme court rejected a contention that the legislature had circumvented the decision in *J.L.W.* by linguistic legerdemain: "The legislature has in effect put a 'spin' on the word 'unfit' by giving the court the discretion to dismiss a petition if the circuit court 'finds that the evidence does not warrant the termination of parental rights.'" *Id.*, 163 Wis. 2d at 109–110, 470 N.W.2d at 922–923. But the circuit court had that discretion under the *J.L.W.* version of the statute as well.

There seems to be no substantive difference between the statute in *J.L.W.*, which permitted the circuit court to terminate parental rights (once grounds for termination were proved) if that was in the child's best interests, and the current statute, which was considered by *B.L.J.*, and which also permits the circuit court to terminate parental rights (once grounds for termination are proved) if that is in the child's best interests. Simply put, the legislature has made it clear that a finding that a parent is unfit at the time of proceeding is not a prerequisite to the termination of

that parent's rights, and the supreme court's latest word is that constitutional principles do not require otherwise.