In re the Termination of Parental Rights to Zachary B., a Person Under the Age of 18:

Monroe County Department of Human Services, Petitioner-Respondent-Petitioner,

v.

Kelli B., Respondent-Appellant.

In re the Termination of Parental Rights to Nathaniel B., a Person Under the Age of 18:

Monroe County Department of Human Services, Petitioner-Respondent-Petitioner,

v.

Kelli B., Respondent-Appellant.

In re the Termination of Parental Rights to Michael B., a Person Under the Age of 18:

Monroe County Department of Human Services, Petitioner-Respondent-Petitioner,

v.

Kelli B., Respondent-Appellant.

Supreme Court

*Nos. 03–0060 through 03–0062. Oral argument October 20, 2003. Decided April 28, 2004.*

## 2004 WI 48

(Also reported in 678 N.W.2d 831.)

For the petitioner-respondent-petitioner there were briefs by *Kerry Sullivan-Flock,* corporation counsel, and *Ellen M. Thorn,* guardian ad litem, and *Arndt, Buswell & Thorn, S.C.,* Sparta, and oral argument by *Ellen M. Thorn.*

For the respondent-appellant there were briefs and oral argument by *Timothy Provis,* Madison.

A joint amicus curiae brief was filed by *Cynthia L. Buchko,* and *Whyte Hirschboeck Dudek S.C.,* Madison, *on behalf of Wisconsin Coalition Against Domestic Violence; Eva Shiffrin, Madison, on behalf of Wisconsin Coalition Against Sexual Assault; and Carol Medaris, Madison, on behalf of Wisconsin Council on Children and Families.*

An amicus curiae brief was filed by *Sandra L. Nowack,* assistant attorney general, and *Peggy A. Lautenschlager,* attorney general, on behalf of the Wisconsin Department of Justice.

¶ 1. ANN WALSH BRADLEY, J. The Monroe County Department of Human Services ("County") seeks review of a published court of appeals' decision that reversed the orders of the circuit court terminating Kelli B.'s parental rights to her three sons.[1] The County contends that the court of appeals erred in holding that Wis. Stat. § 48.415(7) (2001–02) could not constitutionally be applied to Kelli, a victim of long-term and

---

[1] *Monroe County Department of Human Services v. Kelli B.,* 2003 WI App 88, 263 Wis. 2d 413, 662 N.W.2d 360 (reversing a decision of the circuit court for Monroe County, Steven L. Abbott, Judge).

continuous incest perpetrated by her father.[2] Because we determine that the statute, as applied, is not narrowly tailored to advance a compelling state interest, we conclude that it violates Kelli's right to substantive due process. Accordingly, we affirm the court of appeals.[3]

I

¶ 2. Kelli was born on January 17, 1980. Her first son, Zachary, was conceived and born when she was 17 years of age. Her second son, Nathaniel, was conceived when she was 18, and her third son, Michael, was conceived when she was 20. It is undisputed that Kelli's father, Roger, is the father of her children.

¶ 3. By most accounts, Kelli's incestuous relationship with Roger began about the time she was 12.[4] She did not disclose the identity of her children's father until after the birth of her third son, Michael. Kelli

[2] All statutory references are to the 2001–02 version of the Wisconsin Statutes unless otherwise noted.

[3] During the pendency of this appeal, Kelli filed a motion to strike the County's brief or, in the alternative, for an extension of time to file her brief. The court granted the motion for an extension of time, but held in abeyance the motion to strike. Subsequently, Kelli filed a motion to withdraw her motion to strike. That motion was also held in abeyance pending our decision on the merits of the case. The court now grants Kelli's motion to withdraw her motion to strike the County's brief.

[4] According to the court report, Kelli initially told the intake worker as well as the ongoing social worker that sexual abuse from her father began when she was approximately age 12. This is consistent with her testimony at the jury trial of her termination proceedings where she indicated that she was "under the age of twelve" when the sexual intercourse first started. At her father's sentencing hearing, however, Kelli recanted, maintaining that her incestuous relationship with her

testified that she kept this secret because she feared for her life and the lives of her children. Kelli finally broke her silence on May 30, 2001, and informed a child support specialist that her father, Roger, was also the father of her children.

¶ 4. After Kelli's disclosure, Roger was charged with first-degree sexual assault of a child for having sexual contact with Kelli when she was younger than 13, in violation of Wis. Stat. § 948.02(1), and second-degree sexual assault of a child for having intercourse with Kelli before the age of 16 in violation of Wis. Stat. § 948.02(2). The State later dropped the first-degree sexual assault charge and added the charge of incest with a child in violation of Wis. Stat. § 948.06(1).

¶ 5. Pursuant to an agreement, Roger entered a plea of guilty to the incest charge and a felony bail jumping charge, and the sexual assault charge was dismissed. Eventually, Roger was given a sentence of ten years for the incest charge and one year, consecutive, for the bail jumping charge. At both his sentencing and resentencing hearings, the court referred to Kelli as a "victim."

¶ 6. Subsequently, on September 9, 2001, the Monroe County Police Department notified the County that Kelli had been arrested on unrelated charges and that no one was available to care for her minor children. Two caseworkers responded to the call and found the children to be living in unsafe and unsanitary conditions. The children were taken into custody by the County, and it was soon determined that at that time all three were developmentally delayed.

father had begun when she was 17 and that she had wanted the relationship. The circuit court later stated that it did not believe this recantation.

¶ 7. After Kelli admitted that her children were in need of protection and services, a dispositional order was entered under Wis. Stat. § 48.13(10) on November 19, 2001. During the course of the next several months, the County attempted to work with Kelli to get her into a position where she might be able to care for her children. From the beginning, the County's plan was focused on reunifying the children with Kelli.

¶ 8. On June 27, 2002, after months of inconsistent visitation, failure to cooperate with the court order, and an inability to achieve a stable lifestyle, the County petitioned to terminate both Kelli and Roger's parental rights. For Kelli, the petition alleged two separate grounds: (1) that the children were in continuing need of protection or services, Wis. Stat. § 48.415(2); and (2) the ground of incestuous parenthood, Wis. Stat. § 48.415(7). For Roger, the petition alleged (1) incestuous parenthood; and (2) that his parenthood was a result of sexual assault, Wis. Stat. § 48.415(9). Roger has since voluntarily agreed to terminate his parental rights, and his rights are not at issue in this case.

¶ 9. Kelli moved to dismiss the incestuous parenthood ground. She contended that, as the victim of incest, application of this provision violated her right to substantive due process.[5] On August 6, 2002, the circuit court denied her motion, stating that a parent did not have a fundamental right to raise a child born of an incestuous relationship. The court further noted that it had discretion at the disposition stage not to terminate

_____

[5] Kelli also contended that application of this ground violated her right to equal protection. Because she did not pursue this issue on appeal, however, we do not address it here.

59

parental rights if the parent was providing good care to the child born of an incestuous relationship and the incest was not voluntary.

¶ 10. After the circuit court denied Kelli's motion, the County moved for partial summary judgment on the incest ground. The circuit court granted the motion. At that time, the County requested to dismiss without prejudice the remaining ground that the children were in continuing need of protection, and the court granted the motion.

¶ 11. On September 26, 2002, the guardian ad litem brought a motion for reconsideration of the circuit court's partial summary judgment. The guardian argued that summary judgment was inappropriate for such proceedings and that due process required that the court reverse its decision. The court agreed and reversed its partial summary judgment.

¶ 12. The circuit court then held a jury trial to determine whether there was a basis for termination of parental rights on the sole ground of incestuous parenthood. Immediately before trial, Kelli renewed her constitutional challenge to the statute as it applied to her, a victim of long-term and continuous incest perpetrated by her father. The circuit court again denied her motion. The jury returned a verdict with the necessary finding to establish the ground of incestuous parenthood, that is, a finding that Kelli and Roger were related by blood in a degree of kinship closer than second cousin. Accordingly, pursuant to Wis. Stat. § 48.424(4), the circuit court found her to be an unfit parent.[6]

---

[6] Wisconsin Stat. § 48.424(4) provides in part, "If grounds for the termination of parental rights are found by the court or jury, the court shall find the parent unfit. . . ."

¶ 13. After trial, the circuit court held a dispositional hearing to determine whether termination of Kelli's parental rights was in her children's best interests. The court determined that it was. Although it acknowledged that "[Kelli] has been a victim, and she has been damaged . . ." the court concluded that it was not in the children's best interests to wait and see if Kelli was able to make sufficient progress to become a good parent. The court explained that at the disposition stage of a termination of parental rights proceeding, it was required to determine what was in the best interests of the children.

¶ 14. The court of appeals reversed the circuit court's orders terminating Kelli's parental rights. It concluded that the fact of incestuous parenthood in itself did not demonstrate that Kelli was an unfit parent. *Monroe County Department of Human Services v. Kelli B.*, 2003 WI App 88, ¶ 17, 263 Wis. 2d 413, 662 N.W.2d 36. The court recognized that Kelli had a fundamental liberty interest in raising her children. *Id.*, ¶ 14. It also noted that the application of Wis. Stat. § 48.415(7) to Kelli was not narrowly tailored to advance a compelling state interest. *See id.*, ¶¶ 16, 17. Finally, the court rejected the County's argument that the circuit court's discretionary authority at the disposition stage was sufficient to satisfy the requirements of substantive due process. *Id.*, ¶ 20.

¶ 15. Ultimately, the court of appeals held that the ground of incestuous parenthood was unconstitutional as applied to Kelli because she was a victim of her father's incestuous relationship with her. *Id.*, ¶ 21. Specifically, the court concluded that the application of Wis. Stat. § 48.415(7) to Kelli violated her right to substantive due process. *Id.*

61

## II

¶ 16. In this case we address whether Wis. Stat. § 48.415(7), as applied, violates the constitutional right to substantive due process. Such an issue presents a question of law subject to independent appellate review. *See State v. Allen M.,* 214 Wis. 2d 302, 313, 571 N.W.2d 872 (Ct. App. 1997). We begin with the presumption that the statute is constitutional and resolve any doubt in upholding its constitutionality. *See id.*

¶ 17. Here the parties disagree as to whether the termination of Kelli's parental rights implicates a fundamental liberty interest. If it does, we review the question while employing a standard of strict scrutiny. *Winnebago County DSS v. Darrel A.,* 194 Wis. 2d 627, 639, 534 N.W.2d 907 (Ct. App. 1995). This requires the County to show that the statute, as applied, is narrowly tailored to advance a compelling interest that justifies interference with Kelli's fundamental liberty interest. *See id.* If a fundamental liberty interest is not implicated, then we need only review the termination of Kelli's parental rights under the standard of rational basis. *See Allen M.,* 214 Wis. 2d at 314, n. 12. This is satisfied if the legislative enactment bears a rational relation to some legitimate end. *State v. McCaughtry,* 2003 WI 80, ¶ 41, 263 Wis. 2d 83, 664 N.W.2d 596.

## III

¶ 18. We begin our analysis with an examination of the statute at issue. Wisconsin Stat. § 48.415(7) provides for the termination of parental rights based on the ground of incestuous parenthood:

48.415 Grounds for involuntary termination of parental rights ... Grounds for termination of parental rights shall be one of the following:

...

(7) INCESTUOUS PARENTHOOD. Incestuous parenthood, which shall be established by proving that the person whose parental rights are sought to be terminated is also related, either by blood or adoption, to the child's other parent in a degree of kinship closer than 2nd cousin.

¶ 19. Kelli asserts that the statute, as applied to her, violates her constitutional right to substantive due process. This right emanates from the Fourteenth Amendment of the Constitution.[7] In essence, it protects against governmental actions that are arbitrary and wrong "regardless of the fairness of the procedures used to implement them." *Penterman v. Wisconsin Elec. Power Co.,* 211 Wis. 2d 458, 480, 565 N.W.2d 521 (1997) (citations omitted). Substantive due process has been traditionally afforded to fundamental liberty interests, such as marriage, family, procreation, and bodily integrity. *Id.* at 480–81, n. 10. Its analysis balances the state's compelling interests with its chosen method of protecting those interests.

¶ 20. The threshold inquiry we address is whether Kelli has a fundamental liberty interest in parenting her children. The County contends that she

---

[7] The Due Process Clause of the Fourteenth Amendment prohibits a state from depriving "any person of life, liberty, or property, without due process of law[.]" *See also* Wis. Const. art. I, §§ 1 and 8.

does not.[8] It cites *Allen M.* for the proposition that "no court has ever recognized incestuous parenthood or the act of incest as a fundamental right." 214 Wis. 2d 302, 314, n. 12. Furthermore, it argues that Kelli did not have a substantial relationship with her children, despite the fact that she had custody and lived with them until September 9, 2001, when they were three years old, two years old, and nearly seven months old respectively.

¶ 21. In *Allen M.,* the court of appeals addressed a constitutional challenge to Wis. Stat. § 48.415(7) in a different factual setting. There, two biological siblings, engaged in a consensual and continuing incestuous relationship, maintained that the termination of their parental rights violated due process and equal protection. *Id.* at 306. Although the court ultimately reviewed the statute under strict scrutiny, it stated in a footnote that it was "intrigued" by the State and guardian ad litem's assertion that rational basis review was appropriate because the siblings did not have a fundamental right to raise a child born of an incestuous relationship. *Id.* at 314, n. 12.

¶ 22. The County skews the question before us when it attempts to apply this comment of the *Allen M.* court to the facts of this case. The question is not, as asserted by the County, whether any court "has ever recognized incestuous parenthood or the act of incest as a fundamental right." To suggest that anyone here is asserting that the act of incest is a fundamental liberty interest obfuscates the focus.

---

[8] In the court of appeals, the County apparently conceded that Kelli has a fundamental liberty interest in parenting her children. *Kelli B.,* 263 Wis. 2d 413, ¶ 14. However, it now maintains that she does not. Although this issue has arguably been waived, we nevertheless address it here.

¶ 23. Rather, the question is whether a parent who has a substantial relationship with his or her child has a fundamental liberty interest in parenting the child. Our case law recognizes this fundamental liberty interest. *See Parental Rights to SueAnn A.M.,* 176 Wis. 2d 673, 686, 500 N.W.2d 649 (1993); *In Interest of Baby Girl K.,* 113 Wis. 2d 429, 446–47, 335 N.W.2d 846 (1983).

¶ 24. Here, Kelli established this fundamental liberty interest by living with her children and having custody of them. *See In Interest of J.L.W.,* 102 Wis. 2d 118, 135, 306 N.W.2d 46 (1981). The County has not cited, and we have not discovered, any precedent that would support its position that a parent in Kelli's situation, a victim of long-term and continuous incest, is excluded from this constitutional protection. Accordingly, we conclude that Kelli does have a fundamental liberty interest in parenting her children that requires review under the standard of strict scrutiny.

¶ 25. Under that standard, we next consider whether the statute, as applied to Kelli, is narrowly tailored to advance a compelling state interest. "Incestuous parenthood" is one of 11 grounds set forth by Wis. Stat. § 48.415. The compelling interest underlying the statute is to protect children from unfit parents. *See* Wis. Stat. § 48.01.

¶ 26. As applied to Kelli, we conclude that the incestuous parenthood ground as set forth in Wis. Stat. § 48.415(7) is not narrowly tailored to advance the compelling state interest underlying the statute. The reason it is not narrowly tailored is that it renders

people like Kelli per se unfit solely by virtue of their status as victims. While we recognize a correlation between perpetrators of incest and unfit parents, we fail to see how being victimized by one's parent or relative necessarily warrants the same conclusion. The fact of incestuous parenthood does not, in itself, demonstrate that victims like Kelli are unfit parents.

¶ 27. We agree with the State of Wisconsin, Department of Justice, that filed an amicus curiae brief in support of Kelli. It asserts that it is fundamentally unfair to terminate the parental rights of victims of incest based solely on that status:

> In using Wis. Stat. § 48.415(7) to find a victim unfit to parent her child based solely on the fact of her victimization—without regard for her actual parenting activities and/or the actual condition of her children— Monroe County uses this crime victim's plight against her.

In accord with the Wisconsin Department of Justice, we determine that it is fundamentally unfair to terminate Kelli's parental rights based solely on her status as a victim of incest.

¶ 28. In addition to the compelling interest underlying the statute, the County asserts two specific compelling state interests that justify the interference with Kelli's liberty interest: (1) the deterrence of father-daughter incest; and (2) the protection of children from psychological harm. Although we agree with the County that both interests are compelling, we are not persuaded that the statute, as applied to Kelli, is narrowly tailored to advance either one.

66

¶ 29. In its first argument, the County contends that the application of Wis. Stat. § 48.415(7) to Kelli serves to deter "future incestuous conduct resulting in birth between fathers and daughters." It asserts:

> The question put to this Court is whether it would be better to condone the biological realities of these children's births or discourage it, and any future incestuous conduct resulting in births between fathers and daughters by refusing to bestow legal protection on the relationship between Kelli and her children.

¶ 30. We conclude that the statute, as applied to Kelli, is not narrowly tailored to advance the compelling interest of deterring father-daughter incest. The concept of deterrence presupposes that Kelli had a meaningful choice in her relationship with her father. Yet the facts here do not support this presupposition. Rather, they support our conclusion as a matter of law that she is a victim.

¶ 31. From the time Kelli was 12 years old, continuing through the birth of her third child nine years later, she was involved in an incestuous relationship with her father. The facts reflect that she was a victim of this long-term and continuous relationship. Her father was convicted of felony incest with a child. The County's own petition to terminate Roger's parental rights alleged that it was a "substantiated [fact] that all three of Kelli's minor children are the products of sexual assault." At both Roger's sentencing and resentencing hearings, the circuit court recognized that Kelli was a victim. Finally, at the dispositional hearing, the circuit court acknowledged, "[a]s to Kelli, it's a very sad

story. There is no question about it. And she has been a victim, and she has been damaged . . . ."[9]

¶ 32. Given her status as a victim, the statute is not narrowly tailored to promote the compelling state interest of deterring father-daughter incest. The reason it is not narrowly tailored is because it applies not only to perpetrators who may be amenable to deterrence but also to incest victims, for whom deterrence plays no role.

■

¶ 33. Additionally, the County asserts that failing to apply the statute to victims like Kelli would be promoting or "admitting a de facto acceptance of incestuous parenthood." We note that the Wisconsin legislature already discourages incestuous parenthood through several of its statutes. The legislature has criminalized incestuous sex.[10] It has also criminalized incest with a child.[11] Given the existence of these

---

[9] Despite these facts, the dissent questions Kelli's status as a victim and asserts that her non-consent should be established at trial by a jury. Dissent, ¶ 90. Because we determine as a matter of law that Kelli was a victim, we need not address how the issue of non-consent should be raised and decided in future cases.

[10] Wisconsin Stat. § 944.06 states, "Whoever marries or has nonmarital sexual intercourse with a person he or she knows is a blood relative and such relative is in fact related in a degree within which the marriage of the parties is prohibited by the law of this state is guilty of a Class F felony."

[11] Wisconsin Stat. § 948.06 states, "Whoever does any of the following is guilty of a Class C felony:

(1) Marries or has sexual intercourse or sexual contact with a child he or she knows is related, either by blood or adoption, and the child is related in a degree of kinship closer than 2nd cousin; or

(2) Is a person responsible for the child's welfare and:

provisions, we are not persuaded that failing to apply the statute to victims like Kelli is tantamount to a "de facto acceptance of incestuous parenthood."

¶ 34. As a final compelling state interest, the County maintains that termination is necessary to protect Kelli's children from psychological harm encountered by being raised in an incestuous household. Specifically, it cites *Allen M.* in support of its argument:

> . A statute that declares incestuous parents unfit acknowledges the fundamentally disordered circumstances in which the child of an incestuous relationship will be raised. Moreover, it recognizes the vulnerability of the child and the compelling interest in protecting children from psychological confusion and emotional damage they likely will suffer as a result of being born to and living within an incestuous family.

214 Wis. 2d at 320.

¶ 35. The psychological harm described in *Allen M.* stemmed from the prospect of being raised in a home in which the parents were engaged in a consensual and continuing incestuous relationship. There is no evi-

(a) Has knowledge that another person related to the child by blood or adoption in a degree of kinship closer than 2nd cousin has had or intends to have sexual intercourse or sexual contact with the child;

(b) Is physically and emotionally capable of taking action that will prevent the intercourse or contact from occurring or being repeated;

(c) Fails to take that action; and

(d) The failure to act exposes the child to an unreasonable risk that intercourse or contact may occur between the child and the other person or facilitates the intercourse or contact that does occur between the child and the other person."

dence that Kelli intended to subject her children to such an environment. Indeed, by reporting her father to the proper authorities, Kelli demonstrated an intent to end the incestuous relationship. As a result we determine that the statute, as applied to Kelli, does not meet the standard of strict scrutiny.

¶ 36. Thus, we conclude that the statute, as applied here, is not narrowly tailored to advance any of the compelling state interests offered by the County. Kelli is a victim of long-term and continuous incest perpetrated by her father. Wisconsin Stat. § 48.415(7), applied to a victim like Kelli, is not narrowly tailored to protect children from unfit parents, does not promote deterrence, and does not protect children from the psychological harm of being raised in an incestuous family.

¶ 37. Perhaps the greatest difficulty we have with the County's position is that it elected to prove Kelli's parental unfitness *solely* on the ground of incestuous parenthood, rather than relying on other statutory grounds. It may well be that the County can ultimately prove Kelli's unfitness on other grounds. Initially, it alleged that her children were in continuing need of protection or services, Wis. Stat. § 48.415(2). However, the County dismissed that ground because it thought it more expedient to pursue only the incestuous parenthood ground.[12]

---

[12] Contrary to the dissent's assertion, we are not refusing "to recognize that the state has a compelling interest in terminating the parental rights of a parent who shows serious deficiencies in the ability to raise her children as a result of her victimization from incest." Dissent, ¶ 81, n. 15. In making such a statement, the dissent conflates the grounds for unfitness and reads something into Wis. Stat. § 48.415(7) that is not there.

¶ 38. There can be little doubt that the County's objective was to do what was best for Kelli's children. But in taking the route thought to be the easiest, the County attempted to demonstrate Kelli's unfitness as a parent solely on her status—a victim of incest when her children were conceived. Accordingly, we agree with Kelli that the County's actions have implicated her constitutional right to substantive due process.

¶ 39. In its defense, the County maintains that the circuit court's discretion at the disposition stage to dismiss pursuant to Wis. Stat. § 48.427(2)[13] is sufficient to satisfy Kelli's right to substantive due process. The circuit court cited this discretion as part of its rationale in denying Kelli's motion to dismiss. It explained that it had authority at the disposition stage not to terminate parental rights if the parent was providing good care to the child born of an incestuous relationship and the incest was not voluntary.

¶ 40. Again, the County's argument misses its mark. Here, Kelli's challenge is one of substantive due process, not procedural due process. In such cases, the existence of extra procedural protections cannot cure

---

Of course we recognize that the state has a compelling interest in terminating the rights of a parent who shows serious deficiencies in the ability to raise her children. A ground that would address those deficiencies, however, is not before us. Rather, the only ground before us is incestuous parenthood, which defines unfitness based on a status determination. Accordingly, all that the County had to prove was that Kelli and Roger were related by blood in a degree of kinship closer than second cousin.

[13] Wisconsin Stat. § 48.427(2) states, "The court may dismiss the petition if it finds that the evidence does not warrant the termination of parental rights."

the substantive due process violation. *See Penterman,* 211 Wis. 2d at 480. Therefore, it is irrelevant to inquire into the adequacy of the termination procedure, or, more specifically, whether the procedure applicable at the dispositional phase satisfies Kelli's constitutional rights.

¶ 41. In addition to constitutional considerations, Kelli's position is also supported by strong public policy favoring the protection of crime victims. Article I, § 9m of the Wisconsin Constitution provides, "[t]his state shall treat crime victims, as defined by law, with fairness, dignity and respect for their privacy." Furthermore, the Wisconsin legislature enacted Wis. Stat. ch. 950 to ensure that victims have access to, and involvement with, the criminal justice system. *See* Wis. Stat. § 950.01. Taken together, these provisions send a strong message concerning the state's interest in the treatment of crime victims.

¶ 42. We are mindful of this public policy in reaching our decision today. Were we to accept the County's position, Wisconsin would become the only state to authorize the termination of parental rights of victims as well as perpetrators of incest.[14] Not only would this

---

[14] *See,* Ala. Code § 26–18–7 (2003); Alaska Stat. § 25.23.180 (Michie 2002); Ariz. Rev. Stat. § 8–533 (2003); Ark. Code Ann. § 9–9-220 (Michie 2003); Cal. Welf. & Inst. Code § 366.26 (West 2003); Colo. Rev. Stat. § 19–3-604 (2003); Conn. Gen. Stat. § 45a-717 (2003); Del. Code Ann. tit. 13 § 1103 (2003); Fla. Stat. ch. § 39.806 (2002); Ga. Code Ann. § 15–11–94 (2003); Haw. Rev. Stat. § 571–61 (2003); Idaho Code § 16–2005 (Michie 2003); 705 Ill. Comp. Stat. 405/2–13 (2003); Ind. Code § 31–35–3-4 (2003); Iowa Code § 232.116 (2003); Kan. Stat. Ann. § 38–1583 (2002); Ky. Rev. Stat. Ann. § 625.090 (Michie 2003); La. Children's Code art. 1015 (West 2002); Me. Rev. Stat. Ann. tit. 22 § 4055 (West

undermine the state's general efforts to support crime victims, but it would also create a powerful disincentive for victims like Kelli to come forward in the first place.

¶ 43. In sum, we determine that Kelli has a fundamental liberty interest in parenting her children. Wisconsin Stat. § 48.415(7), as applied to Kelli, a victim of long-term and continuous incest perpetrated by her father, is not narrowly tailored to advance a compelling state interest. Therefore, like the court of appeals, we determine that the application of the statute to Kelli violated her right to substantive due process. Accordingly, we affirm the court of appeals.[15]

*By the Court.*—The decision of the court of appeals is affirmed.

2003); Md. Code Ann., Fam. Law § 5–313 (2003); Mass. Ann. Laws ch. 210, § 3(Law. Co-op 2003); Mich. Comp. Laws Ann. § 712A.19b (West 2003); Minn. Stat. § 260C.301 (2003); Miss. Code Ann. § 93–15–103 (2003); Mo. Rev. Stat. § 211.447 (2003); Mont. Code Ann. § 41–3-609 (2003); Neb. Rev. Stat. § 43–292 (2003); Nev. Rev. Stat. Ann. §§ 128.105 (Michie 2002); N.H. Rev. Stat. Ann. § 170–C:5 (2002); N.J. Stat. Ann. § 9:2–19 (West 2003); N.M. Stat. Ann. § 32A-4–28 (Michie 2003); N.Y. Soc. Serv. Law § 384–b(4) (McKinney 2003); N.C. Gen. Stat. § 7B-1111 (2003); N.D. Cent. Code § 27–20–44 (2003); Ohio Rev. Code Ann. § 2151.414 (2003); Okla. Stat. tit. 10, § 7006–1.1 (2002); Or. Rev. Stat. § 419B.502 (2003); 23 Pa. Cons. Stat. § 2511 (2003); R.I. Gen. Laws § 15–7-7 (2002); S.C. Code Ann. § 20–7-763 (Law. Co-op. 2003); S.D. Codified Laws § 26–8A-26.1 (Michie 2003); Tenn. Code Ann. § 36–1-113 (2003); Tex. Fam. Code Ann. § 161.001 (Vernon 2003); Utah Code Ann. § 78–3a-407 (2003); Vt. Stat. Ann. tit. 15A, § 3–504 (2003); Va. Code Ann. § 16.1–283 (Michie 2003); Wash. Rev. Code § 13.34.180 (2003); W. Va. Code § 49–6-5b (2003); Wyo. Stat. Ann. § 14–2-309 (Michie 2002).

[15] When a statute is held to be unconstitutional as applied to particular facts of a given case, it may be applied in other contexts. *State v. Konrath,* 218 Wis. 2d 290, 304, n. 13, 577 N.W.2d 601 (1998).

¶ 44. PATIENCE D. ROGGENSACK, J., did not participate.

¶ 45. DAVID T. PROSSER, J. (*dissenting*). This is a sad case, with profound implications for a mother, her three children, and public policy.

¶ 46. The majority asserts that the application of Wis. Stat. § 48.415(7) to Kelli B. violates her right to substantive due process because, as applied, the statute "is not narrowly tailored to advance a compelling state interest." Majority op., ¶¶ 1, 32. The majority concludes that Kelli B. "has a fundamental liberty interest in parenting her children," *id.*, ¶ 43, and this interest may not be terminated on "incestuous parenthood" grounds because Kelli B. was "a victim of long-term and continuous incest perpetrated by her father." *Id.* In short, the State may not use Kelli B.'s status as a crime victim as grounds to terminate her fundamental liberty interest.

¶ 47. Upon reflection, this case is more complicated than the majority is prepared to acknowledge. "Incestuous parenthood" is a legitimate ground for termination of parental rights in situations where an incestuous parent was the "perpetrator" of incest, where an incestuous parent capable of consent was a willing participant in incest, and where an incestuous parent's inability to provide for the emotional, physical, and developmental needs of the offspring of incest is inextricably linked to the parent's victimization from incest. In approving an "as applied" challenge to the constitutionality of the statute, the majority opinion is disturbingly selective in its consideration of facts and curiously unhelpful in explaining how it believes the

74

case should have been handled in circuit court. Because I believe the opinion will create problems for the future, I respectfully dissent.

## I. INCEST STATUTES

¶ 48. There are several Wisconsin statutes that address incest. In the criminal code, Wis. Stat. § 944.06 reads as follows: "Whoever marries or has nonmarital sexual intercourse with a person he or she knows is a blood relative and such relative is in fact related in a degree within which the marriage of the parties is prohibited by law is guilty of a Class F felony." Wisconsin Stat. § 948.06 focuses on incest with a child, providing in part that "Whoever . . . (1) [m]arries or has sexual intercourse or sexual contact *with a child* he or she knows is related, either by blood or adoption, and the child is related in a degree of kinship closer than 2nd cousin" is guilty of a Class C felony. (Emphasis added.)[1]

¶ 49. In the chapter on marriage, Wis. Stat. § 765.03(1) reads in part:

> No marriage shall be contracted . . . between persons who are nearer of kin than 2nd cousins except that marriage may be contracted between first cousins where the female has obtained the age of 55 years or where either party, at the time of application for a marriage license, submits an affidavit signed by a physician stating that either party is permanently sterile. Relationship under this section shall be computed by the rule of the civil law, whether the parties to the marriage are of the half or of the whole blood.

The rule of the civil law alluded to in § 765.03(1) is codified in Wis. Stat. § 990.001(16).

---

[1] At the time Roger B. was prosecuted in 2001, incest under Wis. Stat. § 948.06 was denominated a Class BC felony.

¶ 50. These incest statutes reflect important concerns. "The rationale behind punishing incest is founded on . . . the danger of biological mutations which might occur in the issue of such relationships[ ] and . . . the desire to protect children from the abuse of parental authority." 42 C.J.S. Incest § 2(b) 57–58 (1991) (citing *People v. York,* 329 N.E.2d 845, 846–47 (Ill. App. Ct. 1975)).[2] The latter concern should be expanded to include a desire to protect children from sexual abuse

---

[2] Wisconsin Stat. § 765.03(1) excepts marriages between first cousins in limited situations. These exceptions underscore the legislature's concern about "biological mutations," that is, genetic problems in the issue of incestuous relationships.

The genetic concern about incestuous offspring is under attack. *See, e.g.,* Carolyn S. Bratt, *Incest Statutes and the Fundamental Right of Marriage: Is Oedipus Free to Marry?* 18 Fam. L.Q. 257, 267–81 (1984). Professor Bratt contends that "[t]he primary misconception underlaying the asserted hereditary-biological function of incest statutes is the belief that consanguineous matings cause genetically defective offspring. A cursory examination of Mendelian, autosomal, dominant and recessive inheritance reveals that such a belief is simply inaccurate." Bratt, *supra,* at 267–68.

After stating her premise, Professor Bratt writes:

> Genetic research has identified many genetically linked disorders and has determined the probability of their occurrence. Research has also established that recessive autosomal traits are more severe in their manifestation than are dominant autosomal traits. On the average each human carries between one and five deleterious recessive genes. However, these deleterious genes usually do not result in offspring who exhibit the trait associated with the gene because there is only a very small likelihood of mating with a person who carries the same recessive gene at the same locus on the same chromosome in the same pair. The danger in consanguineous matings is not, as commonly believed, that such unions cause or increase the number of deleterious recessive genes in the offspring. Rather, such matings increase the probability that the spouses both carry an identical recessive gene which will be

by any close blood relative. Marriage between close blood relatives often facilitates one or both of these evils.

passed to the offspring in the double dose necessary for the expression of the trait associated with that recessive gene.

For example, if a particular individual is heterozygous for a recessive gene trait, there is a 0.5 probability that the individual's parent, child or sibling is also heterozygous for the trait. If the heterozygous individual has offspring by her or his parent, child, or sibling, the probability that the offspring will be homozygous for the recessive gene trait is 0.125. Assuming the mean number of harmful recessive gene traits carried per person is one and there is no history of deleterious gene traits in the pedigree, the risk of homozygosity, i.e., expression of the recessive gene trait, in the offspring of selected consanguineous matings is [0.1250 for 1 Lineals (parent, child) and 2 Collaterals (siblings)].

The probabilities of offspring who are homozygous for a deleterious recessive gene appear low, but they are higher than the 0.001 probability of homozygosity for a deleterious recessive gene in nonconsanguineous matings when there is no family history of such recessive gene traits. Some empirical data suggest that consanguineous matings lead to an increase in infant mortality, congenital birth defects and anthropometric changes.

Bratt, *supra*, at 271–73.

Professor Bratt's own calculations indicate that the probability that a single deleterious recessive gene will appear in the offspring of first degree lineals or second degree collaterals is 125 times greater than in a nonconsanguineous mating. The probability of genetic problems is bound to go up if consanguineous mates are carrying more than one deleterious recessive gene or if there is a history of deleterious gene traits in the family. It is the duty of legislators to decide whether these probabilities warrant statutory attention. *See also* Patricia A. Baird & Barbara McGillivray, *Children of Incest*, 101 Journal of Pediatrics 854–58 (Nov. 1982); *Children born as a result of incest*, 282 Brit. Med. J. 250 (Jan. 24. 1981); Alvin A. Rosenfeld, *Incidence of a History of Incest Among 18 Female Psychiatric Patients*, 136:6 Am. J. Psychiatry 791 (June 1979); *Incest*,

77

¶ 51. In addition, nonmarital sexual intercourse with a close blood relative may constitute adultery.[3] When it does, it is likely to undermine the existing marriage relationship. Incest can also spawn intra-family rivalry and tension and create psychological confusion in the family about the appropriate roles of family members. Incest is sometimes described as the product of an already dysfunctional family.[4] The conception of incestuous children will usually lead either to abortion[5] or to the exacerbation of existing problems within the family.

¶ 52. "Marriage is the foundation of family and society. Its stability is basic to morality and civilization, and of vital interest to society and this state." Wis. Stat. § 944.01. In some circumstances, marriage between close blood relatives would completely pervert the concept of the nuclear family.

¶ 53. In the Children's Code, "Incestuous parenthood" is one of the grounds for termination of parental rights.[6] This ground complements the statutes on incest but also embodies separate and distinct concerns

---

*Inbreeding, and Mental Abilities,* Brit. Med. J. 4, 336–37 (Nov. 11, 1967); Morton S. Adams & James V. Neel, *Children of Incest,* 40 Pediatrics 55–62 (July 1967).

[3] *See* Wis. Stat. § 944.16.

[4] Anna C. Salter, *Treating Child Sex Offenders and Victims* 39–40 (1988).

[5] *See* Wis. Stat. §§ 20.927(2) and 253.10(3m)(b)(1).

[6] "(7) Incestuous Parenthood. Incestuous parenthood, which shall be established by proving that the person whose parental rights are sought to be terminated is also related, either by blood or adoption, to the child's other parent in a degree of kinship closer than 2nd cousin." Wis. Stat. § 48.415(7).

78

about the ability of incestuous parents to raise and support their children in a manner that does not victimize the children.

## II. FELONY INCEST

¶ 54. The felony incest statute, Wis. Stat. § 944.06, prohibits marriage or sexual intercourse with a person who is a blood relative nearer of kin than 2nd cousin according to the rule of civil law. This statute is broadly written to include relationships with such blood relatives as grandparents, aunts, uncles, and cousins.[7]

¶ 55. Incest may involve two adults, two minors, or one adult and one minor. If the state chooses to prosecute a person for incest, it will select either § 944.06 or § 948.06, depending upon the facts.

¶ 56. A person charged with incest may also be charged with sexual assault, provided that the state is able to prove the requisite non-consent by the victim of the sexual assault. *See State ex rel. Lawrence v. Burke,* 253 Wis. 240, 247, 33 N.W.2d 242 (1948); *Porath v. State,* 90 Wis. 527, 536, 63 N.W. 1061 (1895).

¶ 57. Consent is a defense to a charge of sexual assault but consent is not a defense to a charge of incest. Mutual consent does not validate unlawful incest. This case indirectly raises the question whether a person's *non-consent* to sexual intercourse would be a defense if that person were prosecuted for incest.

---

[7] "Sexual intercourse" is defined in Wis. Stat. §§ 940.225(5)(c) and 948.01(6). Because of these definitions, the incest statute does not exclude same sex sexual intercourse between close blood relatives. However, application of the felony incest statute to consenting *adults* of the same sex would appear to go beyond the traditional notion of incest and not reflect the core objectives of the offense.

79

¶ 58. When a person is charged with incest under § 944.06 or § 948.06, the person may contend that no crime was committed because the person did not have "knowledge" of a blood relationship (or of "adoption" in the case of § 948.06(1)). "Knowledge" is an essential element of the offense. The person may also rely on such statutory defenses as "intoxication," Wis. Stat. § 939.42, "mistake," Wis. Stat. § 939.43, or "coercion," Wis. Stat. § 939.46, depending on the facts.

¶ 59. If non-consent were recognized as a defense to incest, it would likely be a broader defense than the statutory defense of coercion, which is narrowly defined in § 939.46. A non-consent defense would present legal issues about definition as well as burden of proof.[8]

¶ 60. A child involved in sexual contact or sexual intercourse who has not attained the age of 16 years is incapable of consent as a matter of law. Wis. Stat. § 948.02(1) and (2). The same cannot be said of a child who is age 16 or 17 and it certainly cannot be said of an adult. Thus, when the victim of a *sexual assault* is age 16, 17, or older, the state must prove that the sexual intercourse or sexual contact occurred without consent, although the state could proceed under Wis. Stat. § 948.09, a misdemeanor in which a 16- or 17 year-old's nonconsent is not an element. It follows that when the state fails to charge one party to *incest* with sexual assault or fails to prove such a charge, the second party's consent remains an open question of fact as long as the second party is capable of giving consent.

¶ 61. In my view, a person who has engaged in sexual intercourse *without consent* may not be convicted of felony incest under any statute. This means that I would recognize a non-consent defense to incest

[8] For discussion of burden of proof in defenses, see *Moes v. State,* 91 Wis. 2d 756, 763–69, 284 N.W.2d 66 (1979).

80

even though that defense does not appear in the statutes. Conversely, I believe a person who has attained the age of 16 years and is capable of giving informed consent is subject to prosecution for incest if the person freely agrees to have sexual intercourse with a blood relative nearer of kin than 2nd cousin.

¶ 62. In this case, Roger B. was never convicted of sexual assault. He was convicted of incest under Wis. Stat. § 948.06, an offense in which Kelli B.'s consent or non-consent was immaterial. Thus, Kelli's *non-consent* to incest was not established and remained a material issue of fact. She gave birth to three incestuous children, one of whom was conceived and born when she was 17, and two of whom were conceived and born when she was an adult. None of Kelli's children was born under circumstances in which she was incapable of giving consent to sexual intercourse as a matter of law.

¶ 63. In fact, Kelli testified *under oath* that she wanted the relationship with her father. At Roger B.'s sentencing hearing—which occurred on November 1, 2001, more than seven months before Monroe County moved to terminate Kelli's parental rights—Kelli testified that: "Well, I don't think [my father] should go to prison because it was just as much my fault as it is his, because I wanted the relationship." On cross-examination, the following exchange occurred:

Q Wouldn't you agree that in a normal parent child
 relationship that the parent bears some respon-
 sibility for the behaviors and activities of the
 child?

A - Well, the thing is is it was my fault just as much
 as it was his because I wanted it just like he did.

. . . .

81

Q And you don't see anything wrong with the activity that occurred in this case?

A No.

¶ 64. In addition, in response to questions from the court, Kelli denied that her father had been physically abusive to her.

Q In the presentence report it says that there [are] some charges pending . . . . [A] charge of battery against your father and intimidation of a victim . . . . [H]e is accused of being physically and verbally abusive to you on two occasions. Are you saying that didn't happen?

A The verbal abuse was going on, but the physical abuse was not.

Q And the [PSI] report says that, and again the person who prepared the report didn't have the opportunity to talk to you, but said [Roger B.] threatened to kill you, and that if he goes to jail you're going to jail?

A That's not true.

Q That's not true. Okay. And it also says he is accused of strangling you to the point where you could not breathe?

A That's not true.

Q Do you know where somebody would come up with this kind of information if it's not true?

A I said it to get him away from me, so I lied about it.

82

Q So you lied to the authorities about what your father did?

A Yes.

¶ 65. The majority is probably correct in believing that this testimony is not credible; that Kelli B. was so victimized and traumatized by her father that she endured many years of extreme sexual abuse and three pregnancies without ever telling authorities; that even as an adult, she was unable to break free from her father's dominance; that even when her father was locked up in jail, she was still so susceptible to his influence that she came to court to lie repeatedly in his behalf.

¶ 66. In the book *On Trial, America's Courts and Their Treatment of Sexually Abused Children* (2d ed. 1991), Billie Wright Dziech & Judge Charles B. Schudson explain that:

> Most [child victims of sexual abuse] disclose the incidents slowly and reluctantly over a period of weeks, months, or even years. Some live all of their lives without admitting to anyone what happened to them. Of former victims responding to the [Los Angeles] *Times* poll, 42 percent replied they told someone within a year, 21 percent said they waited more than a year, and 36 percent reported that they had told no one until asked by the interviewer. This response is indicative of the process that psychiatrist Roland Summit, after thousands of first-hand observations and consultations with professionals dealing with victims, described as the "child sexual abuse accommodation syndrome."
>
> . Summit noted that sexually abused children generally reveal five characteristics in coping with their dilemmas: secrecy, helplessness, accommodation (seeing oneself as responsible for the victimization), delayed disclosure, and retraction or recantation. Al-

though he originally defined these patterns in terms of incest, increased experience with and understanding of child sexual abuse has led professionals to recognize that the syndrome appears in victims of extrafamilial abuse as well.

Dziech & Schudson, *supra* at 3–4.

¶ 67. Applying this analysis, a court could find that Kelli B. demonstrated classic symptoms of child sexual abuse, even as an adult, in failing to report incestuous molestation. However, because Kelli gave birth to three incestuous children over a period of several years, her case necessarily represents either *extreme* victimization or *actual* consent.[9]

¶ 68. In drafting the provision on "incestuous parenthood," the legislature must have considered the parenthood of a father who was the perpetrator of

---

[9] The law ought to require a finding that an adult party to incest did not consent to incest before holding the adult blameless for incestuous offspring. This may require new definitions of consent and non-consent. "Consent" is defined, for use in the sexual assault statute, as "words or overt actions by a person who is competent to give informed consent indicating a freely given agreement to have sexual intercourse or sexual contact." Wis. Stat. § 940.225(4). In this case, Kelli B. gave birth to three children, one of whom was conceived and born when she was 17, and two of whom were conceived and born when she was an adult. At least with respect to Kelli B.'s second and third children, it is not clear that the State could have proved that Roger B. violated Wis. Stat. § 940.225(1)(a): "Whoever . . . [h]as . . . sexual intercourse with another person *without consent* of that person and causes pregnancy" is guilty of a Class B felony. Wis. Stat. § 940.225(1)(a) (emphasis added). My concern in raising this issue is that the circuit court never made a *finding* that Kelli B. had no responsibility for her second and third incestuous children. Consequently, I do not understand how this court can implicitly make that finding.

incest on his daughter. But in this constitutional challenge, we must also assume that the legislature contemplated incest's potentially extreme, psychologically damaging effect upon the daughter and the impact that this abuse would likely have on her fitness as a parent. The crux of this case is whether the legislature could determine that a person who is a severely traumatized victim of incest may be unable to satisfy the minimum responsibilities of parenthood without victimizing the person's children.

## III. POLICY CONCERNS ABOUT INCESTUOUS PARENTHOOD

¶ 69. The majority appears to have no difficulty with the proposition that incestuous parenthood may be used as a ground to terminate the parental rights of a 'father who is the perpetrator "of long-term and continuous incest" with his daughter. If the daughter did not consent to incest, the father would be culpable of sexual assault as well as incest and should not be rewarded for his criminality by maintaining his rights to nonmarital offspring. This would be true even if the father had a substantial relationship with his child.

¶ 70. A more difficult question is posed when the state seeks to terminate the parental rights of a daughter who gives consent to sexual intercourse with her father. In this situation, the daughter would argue that she has a fundamental liberty interest in parenting her biological child and that she has a relationship with the child. The state could argue that the daughter is a lawbreaker, that she should not be rewarded for her lawbreaking, and that termination is required as a deterrent to similar lawbreaking. The daughter's argument would indirectly implicate the validity and constitutionality of the felony incest statute.

¶ 71. The most difficult question arises in a situation where the daughter does not consent to incest. What is the state's compelling interest in terminating the parental rights of a victim of incest?

¶ 72. Therapist E. Sue Blume writes that:

> Incest is possibly the most crippling experience that a child can endure. It is a violation of body, boundaries, and trust. Unless identified and dealt with, the emotional and behavioral aftereffects can stay with the victim. The very defenses that initially protect the incest survivor later lock these problems into place, interfering with adult functioning and preventing healing or change.

E. Sue Blume, *Secret Survivors, Uncovering Incest and Its Aftereffects in Women* xiv (1990).

¶ 73. William Masters and Virginia Johnson report that "[m]ost researchers and clinicians agree that incest is an intensely damaging psychological experience. It can lead to drug abuse, prostitution, suicide attempts, and a host of other problems." William H. Masters, Virginia E. Johnson, & Robert C. Kolodny, *Masters and Johnson on Sex and Human Loving* 426 (1988). They continue:

> [T]he most striking, but not surprising, finding in incest victims is the long-term persistence of a variety of sexual problems. . . . In many cases, the woman has been unable to form close, intimate, trusting relationships with men because she expects betrayal, rejection, or punishment.
>
> . . . [I]t seems likely that an incestuous relationship between an adult and a child will create major conflicts for the child, even if these are eventually overcome.

Masters, et al., *supra,* at 427.

¶ 74. In her book, Blume describes the "complex and far-reaching" consequences of incest, and labels them as "post-incest syndrome." Blume, *supra,* at vi. She provides an "Incest Survivors' Aftereffects Checklist," building upon the work and studies of rape and incest counselors. The 34–point checklist includes:

6. Eating disorders, drug or alcohol abuse (or total abstinence); other addictions; compulsive behaviors

7. Self-destructiveness; skin carving, self-abuse

8. Phobias

. . . .

10. Suicidal thoughts, attempts, obsession (including "passive suicide")

11. Depression (sometimes paralyzing); seemingly baseless crying

12. Anger issues; inability to recognize, own, or express anger; fear of actual or imagined rage; constant anger; intense hostility toward entire gender or ethnic group of the perpetrator

. . . .

16. Trust issues; inability to trust (trust is not safe); total trust; trusting indiscriminately

17. High risk taking ("daring the fates") . . .

. . . .

19. Guilt, shame; low self-esteem, feeling worthless; high appreciation of small favors by others

. . . .

22. Abandonment issues

. . . .

25. Feeling crazy; feeling different; feeling oneself to be unreal and everyone else to be real, or vice versa; creating fantasy worlds, relationships, or identities . . .

. . . .

27. Sexual issues: . . . "promiscuous" sex with strangers . . . sexual acting out to meet anger or revenge needs . . .

. . . .

33. Stealing (adults) . . .

34. Multiple personality

Blume, *supra,* at xviii-xxi. When the most serious indicia of post-incest syndrome appear, the victim of incest is in a psychologically precarious position to effectively parent children.

¶ 75. The incest victim may be vulnerable in other ways. She is precluded from ever marrying the other parent of her child. The parental rights and responsibilities of the other parent, including the support obligation, are normally terminated in order to separate the two parents and discourage contact be-

tween them. This termination will deprive the victim-parent of both emotional and financial support.[10]

¶ 76. When an unwed teenager becomes pregnant, she often turns to her parents for this sort of support. But a young woman who is the victim of incest by her father may not be able to turn to other family members. Her mother may not be present or there may be tension between mother and daughter.[11]

---

[10] Patricia A. Harrington, *The Disposition of Father-Daughter Incestuous Assault Cases: An Overview* 21 New Eng. L. Rev. 399, 415 (1985–86).

The financial impact of removing the breadwinner from the family is obvious. In addition, "many of the fathers who commit incest at least occasionally provide some form of positive reinforcement to the child they are victimizing, such as gifts, monetary rewards, or special privileges." Masters, et al., *supra,* at 425. The abusive father may also provide emotional support to the victim. Both forms of support are likely ended by the father's forced separation from his daughter.

[11] In her book *Treating Child Sex Offenders and Victims,* Anna C. Salter observed that:

> The literature on the subject of the mother's responsibility for father-daughter incest is quite sizable and can be divided according to the authors' views of the nature of the mother's culpability. Authors differ as to whether the mother (1) actively encourages the incest to occur, (2) is indirectly responsible, (3) fails to set appropriate limits to prevent the incest, and/or (4) is aware of the incest but does not allow herself to acknowledge it.

Anna C. Salter, *Treating Child Sex Offenders and Victims* 35 (1988). After describing these theories, Salter concludes:

> The most objectionable part of this literature is not that which implies some mothers actively collude with incest; *some mothers clearly do.* Of more concern is the implication that all mothers know . . . and the assumption that a lack of knowledge would not render them blameless in any case.

Salter, *supra,* at 40 (emphasis added).

¶ 77. If the victim's mother knew of the incest and did nothing, she is a potential criminal herself. Wis. Stat. § 948.02(3); Jennifer J. Freyd, *Betrayal Trauma* 159–60 (1996); Masters, et al., *supra,* at 424 (emphasis added) (*"Even after incest is discovered by a mother, in more than two-thirds of cases she does not try to help or protect her child."*).

¶ 78. If the mother did not know of the incest, the victim-daughter may still believe that the mother knew and should have intervened.[12] Conversely, if the mother did not know, she may resent the daughter's relation-

---

Masters & Johnson comment further:

> Wives of husbands who commit incest were often themselves the victims of sexual abuse as children and tend to be dependent, disenchanted women who withdraw from the family either through depression or outside diversions. The mother may actually force the daughter into assuming her role, relieved at having the daughter as a "buffer" between her and her husband and sometimes pleased to have to deal with her husband's sexual advances no longer.

William H. Masters, Virginia E. Johnson, & Robert C. Kolodny, *Masters and Johnson on Sex and Human Loving* 424 (1988).

[12] In *Adult Children of Abusive Parents,* Steven Farmer quotes a case study in which a young woman tried to tell her mother of sexual abuse by her stepfather:

> When I was about thirteen, I couldn't take it anymore—my stepdad always touching me, molesting me whenever my mom wasn't around. He had threatened that he would beat the living daylights out of me if I told her, so for three years I didn't say anything. But finally I figured that anything would be better than having to live with this kind of fear. So one day, I took a deep breath and told my mom—right in front of him—what had been going on. She slapped *me*—I couldn't believe it—she slapped *me,* and they both told me I was a liar.

Steven Farmer, *Adult Children of Abusive Parents* 19–20 (1989).

ship with her husband, leading to the husband's possible prosecution, imprisonment, and removal from the family.[13] The mother may view the daughter's silence as acquiescence or complicity. Thus, a daughter who gives birth to an incestuous child may not be able to count on either of her parents for love or support. Other family members have no legal obligation to be helpful, and they may be too embarrassed or resentful to come forward.

¶ 79. A mother must provide for the emotional, physical, and developmental needs of her children. Adequate finances are integral to this responsibility. However, financial support for the victim of incest is often uncertain. Inadequate finances are only one reason why an incestuous mother may distance her children.[14] These children are the product of criminal acts

---

[13] Herbert Maisch writes of the "jealous and hostile rivalry" that can develop between mother and daughter. This situation "is particularly sharply accented when the case concerns stepdaughter-incest resulting in the birth of a child." Herbert Maisch, *Incest* 209 (1972).

[14] Maisch writes about 10 women who gave birth to incestuous children:

> Six of the ten girls adopted an absolutely positive attitude, did not want to be parted from their baby in any way, and tried to cope with their maternal duties as best they could. All the same, one of these girls . . . made a serious attempt at suicide in a situation of social and emotional pressure, almost two years after the birth of her child. Two further juveniles gave up their children and had them put in a home and made available for adoption, and the very young mother, whose childish and artless pregnancy was mentioned above, did not want to see her baby at all. . . . Situations of emotional stress, often serious, also arose after the birth from the jealousy, envy and hatred of their own mother (especially in the cases of love relationships with the stepfather), and the negative

against the mother. They are a financial drain. They may have costly special needs. And they probably curtail the mother's freedom and her prospects for education, employment, and marriage in the future. Herbert Maisch declares that:

> Psychiatric work amongst young people offers constant proof of the fact that, among the direct physiological effects of sexual crime on very young girls, pregnancy is the most serious in human and social terms. The damage is less physical—young mothers have no higher rate of birth complications than adults—than psychological as a result of the grave nature of the offence and the discriminatory reactions of people around her which often heighten this.

Herbert Maisch, *Incest* 210 (1972).

¶ 80. In these circumstances, the state may be required to step in to provide the dysfunctional single parent with financial assistance, medical assistance, and social services. The children born of the victim-mother's incest may become locked in a long holding pattern of foster care, awaiting the potential but uncertain rehabilitation of their mother. They cannot be adopted until their mother's parental rights have been terminated.

¶ 81. To sum up, incestuous parenthood is a legitimate ground for termination of parental rights in situations where an incestuous parent shows serious deficiencies in the ability to raise her children as a result of her victimization from incest. The parent's status as a victim should not be permitted to excuse the failure to perform as a responsible parent, sacrificing

---

reactions and actions of the male partner as well as discrimination from people around her.

Maisch, *supra,* at 213.

the best interests of the children in the process. Children of incest have the same right to a decent, fulfilling life as other children. They are innocent victims of their circumstances. The state should not be precluded from protecting these children and promoting their best interest, if necessary, by a termination of parental rights when incestuous parents are unable to discharge their parental responsibilities.[15]

## IV. STRICT SCRUTINY

¶ 82. The majority concludes that Kelli B. has a fundamental liberty interest in parenting her children. Majority op., ¶¶ 23–24. As a general proposition, biological parents do have this fundamental liberty interest. A parent's desire for and right to the companionship, care, custody, and management of the parent's child is an important interest that warrants deference and, absent a powerful countervailing interest, protection. *Sheboygan County DHHS v. Julie A.B.*, 2002 WI 95, ¶ 22, 255 Wis. 2d 170, 648 N.W.2d 402. "This fundamental liberty interest of parents 'does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State.' " *Id.* (quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982)).

¶ 83. United States Supreme Court decisions and our own cases suggest that the following classes of parents have a fundamental liberty interest: the bio-

---

[15] The majority refuses to recognize that the state has a compelling interest in terminating the parental rights of a parent who shows serious deficiencies in the ability to raise her children as a result of her victimization from incest. The majority does not explain why this is not a compelling state interest, and it does not explain what the test is for determining a compelling state interest.

logical mother of a child, whether or not she is married; the biological parents of a child who are married or were married at the time the child was born; and the biological father of a child if the father, though never married to the mother, has established a substantial relationship with the child. However, an unmarried father who does not have a substantial relationship with his biological child is not likely to have a fundamental liberty interest in parenting the child.

¶ 84. The possession of a fundamental liberty interest in parenting a child does not mean that a parent's rights may not be terminated. It means that the state's action in the termination is subject to strict scrutiny. "[W]hen the state moves to terminate parental rights, 'it must provide the parents with fundamentally fair procedures,' " *Id.* (quoting *Santosky,* 455 U.S. at 754), and must assert an interest in termination that is more compelling than the interest of the parent.

¶ 85. Most often a party whose fundamental liberty interest is at stake attacks the statute that authorizes government action, arguing that the statute is not narrowly tailored to advance a compelling state interest. A facial challenge to the statute attempts to invalidate the statute so that it may not be applied to anyone. An "as applied" challenge to the statute seeks to preclude application of the statute in particular circumstances.

¶ 86. In this case, the majority has not ruled that "incestuous parenthood" is a wholly improper ground upon which to base the termination of a parent's rights. In fact, the majority recognizes "a correlation between perpetrators of incest and unfit parents." Majority op., ¶ 26. In addition, the majority has not overruled *State v. Allen M.,* 214 Wis. 2d 302, 571 N.W.2d 872 (Ct. App. 1997), a case in which the court of appeals upheld

incestuous parenthood as a ground to terminate the parental rights of a brother and sister who engaged in incest and produced a daughter. *Allen M.,* 214 Wis. 2d at 305.

¶ 87. The majority does not demand that the statute be rewritten. Rather, it appears to find that Kelli B. was a "victim" of incest in each of her three pregnancies and concludes that because she was a "victim," Monroe County could not constitutionally apply the incestuous parenthood ground to her.

¶ 88. This appellate conclusion raises questions. The majority goes through the ritual of saying: "We begin with the presumption that the statute is constitutional *and resolve any doubt in upholding its constitutionality.*" Majority op., ¶ 16 (emphasis added). By invalidating the statute, as applied, however, the majority indicates either that there is no doubt about Kelli's non-consent to incest or that her non-consent does not matter, and that, in any event, the state has no compelling interest grounded in incestuous parenthood to terminate her parental rights.

¶ 89. First, we must ask how the majority can say there is no doubt about Kelli's non-consent. Kelli B. was an adult in two of her three pregnancies, she was legally capable of giving consent to sexual intercourse in all three of her pregnancies, and she testified under oath that she "wanted it just like [her father] did." Admittedly, she recanted this testimony months later in the termination proceeding when she had a motive to do so. But Kelli's state of mind could be a disputed fact. The issue here is not whether Kelli actually gave consent to incest. The issue is how the possibility of her consent was ruled out. In short, how did Kelli meet her burden

95

of showing beyond a reasonable doubt that incestuous parenthood could not constitutionally be used in her case?

¶ 90.　An adult biological mother's non-consent to incest is a question of fact. When she puts the constitutionality of the statute at stake, the adult mother has the burden of proving this pivotal fact beyond a reasonable doubt. Is this element established at the fact-finding trial or at the dispositional hearing? I believe it should be established at the fact-finding trial.

¶ 91.　The truth is that Kelli's non-consent was not proved at the *fact-finding* trial. The evidence tending to establish that Kelli was a victim who did not fully consent to incest came in at the *dispositional* hearing, at the same time the County presented evidence about the consequences of the incest to Kelli and to her children.

¶ 92.　The critical evidence in the *Allen M.* case also came in at the dispositional stage, 214 Wis. 2d at 308, and this appears to be the direction provided in *Steven V. v. Kelley H.,* 2004 WI 47, 271 Wis. 2d 1, 678 N.W.2d 856. The majority ought to provide clear guidance on how a person is to satisfy the burden of showing that a statute is unconstitutional "as applied."

¶ 93.　Second, assuming that non-consent to incest is a pivotal element in a termination proceeding, that it is a question of fact, and, for the sake of argument, that the circuit court found that Kelli did not consent to incest, why has this court excluded the circuit court's findings of fact related to the consequences of Kelli's incest victimization? In this "as applied" challenge, why isn't the court bound to consider *all* the facts? The record in this case is overflowing with evidence that

Kelli B. exhibited the indicia of extreme post-incest syndrome and a concomitant unfitness to parent her children.

¶ 94. Some of the facts are as follows:

¶ 95. Kelli B.'s third child was born in mid-February 2001. Her father was charged with incest on June 12, 2001, and convicted August 29, 2001. When Roger B. was incarcerated in June 2001, he left Kelli largely on her own.

¶ 96. The Monroe County Department of Human Services became involved with Kelli and her three children on August 20, 2001, upon receiving a referral that the children were living in an unclean environment and Kelli needed assistance in providing for their care. Several weeks later, on September 9, the Department was advised by law enforcement that Kelli had been arrested and that no one was available to care for her children. When they entered Kelli's residence, County social workers discovered that conditions had deteriorated. They were overwhelmed by a foul smell in the residence. They found "an extremely filthy, dirty, unsanitary and unsafe living condition in the residence," including puddles of urine on the floor, smeared feces on the wall, garbage throughout the residence, overturned furniture, old spoiled stale food, and a multitude of flies. The social workers were unable to locate more than one clean diaper. The other diapers were completely filthy and soiled. The baby was laying in a urine-soaked baby seat or car seat. Food was matted in his hair. The social workers could find no clean clothing for the three children. They also noticed that the two older children were non-verbal and appeared to have communication difficulties. Because all three children were having respiratory problems, the

social workers sought immediate medical care, and all three children were given medication.

¶ 97. The children were taken into temporary custody because they needed protection or services. The court held a follow-up dispositional hearing on November 19. The court ordered the continuation of services as well as additional services for Kelli to assist her in reunification with her children. The court established multiple conditions in its dispositional order that were designed to help Kelli get back on her feet and resume the custody and parenting of her boys.

¶ 98. Ann Garrity, a social worker with the Monroe County Department of Human Services, was Kelli's case manager beginning in December 2001. Ten months later, she prepared a 21–page Court Report and was Monroe County's only witness at the October 9, 2002, dispositional hearing. In her report and in her testimony, Garrity recounted in meticulous detail how Kelli had failed to satisfy the conditions in the November 19, 2001, court order, thus demonstrating her unfitness as a parent.

¶ 99. The picture that emerges from this evidence is of an immature young woman with all the earmarks of post-incest syndrome. Kelli failed to complete required psychological evaluation, failed to show up for appointments, switched doctors, then failed to consistently meet with the new doctors. Kelli had depression problems and post-traumatic stress disorder. She herself testified that she had a nervous breakdown.

¶ 100. Kelli acknowledged having three different "significant others," all women, during the period of the court order. She moved to northern Wisconsin against the advice of her social worker to live with one of these women. This made it very difficult for Kelli to visit her children on a regular basis, and she missed many

scheduled visitations. Kelli visited her boys only twice between June 6 and the October hearing. After she left the Monroe County area, she also failed to participate in the children's doctor appointments and in her own parenting assessment appointments.

¶ 101. Another reason for missed visitations and appointments was that Kelli spent 22 days in jail in February and March 2002, and was jailed again in August and September.

¶ 102. During the court order, Kelli was unable to settle on consistent living arrangements or employment. She provided no verification of income. She did not demonstrate any stability or ability to manage money effectively as she had little or no money to manage. She was not helped in this by the fact that she left high school before graduation.

¶ 103. Kelli reported that her family turned their backs on her once her father was sent to prison. She felt she was blamed by family members for tearing the family apart. She told her social worker that both her mother and her brother knew about the incest. At the dispositional hearing she was critical of both of them. "Obviously," Garrity wrote in her report, "given the significant dysfunction, Kelli does not have a strong support network in place with her extended family."

¶ 104. Garrity described the cool relations between Kelli and her children during her sporadic visitations. She reported that a family support worker noted that early on, when Kelli was visiting her children with her second significant other, the woman "was doing the majority of parenting during the visitation." Garrity wrote that "Kelli is unable to manage all three children effectively at the same time. She appears to focus all of her energy on one of the children, usually . . . the youngest of the three." In her last visit

before the hearing, "All three of the boys were described as very reserved and shy, and needed to be prodded into greetings by Kelli in order to give her any welcoming hugs at all."

¶ 105. In concluding her written report, Garrity wrote:

> Although[ ] there is no doubt that Kelli herself has been significantly victimized throughout her life at the hands of her father, she chose to defend his actions and continued a sexual relationship with him in her adulthood. Kelli is in need of significant mental health treatment to address these issues within her own life and she has not demonstrated a readiness to do that, much to the further victimization of her children. Kelli fails to see the ongoing cycle of abuse within her family and therefore has demonstrated no ability to provide a safe and stable home environment for these children.

¶ 106. Circuit Judge Steven Luse Abbott adopted Ann Garrity's report and made his own observations. He said that Kelli had been a victim but so had her children:

> [W]hen something happens to you, what you do about what happens to you counts more than what happened to you.
>
> . . . . I have seen improvements . . . at least the way [Kelli] conducts herself. But how much time do we have to wait when we're also dealing with kids who are growing up . . . The time is now we have to move on this. There is no question that we cannot spread this out any longer than we have.
>
> . . . . We have to look at what has happened, not what we think may happen in the future. . . . I think in time [Kelli] is going to mature, and she is going to develop and be a real good person, but we can't make these kids wait until that happens.

¶ 107. As I see it, Kelli B.'s many problems are a direct result of her victimization by her father. Her serious deficiencies as a parent are a direct and predictable result of her incest and sexual abuse.

¶ 108. If a biological mother's non-consent to incest is a question of fact that must be established, it is inexplicable why evidence of that fact may be considered but evidence of the direct consequences of that fact upon the fitness of the victim as a parent are excluded.

¶ 109. Third, if the court were to take the position that a biological mother's consent to incest does not matter in a termination proceeding, it would open the door to incestuous relationships and undermine part of the basis for the felony incest and marriage limitation statutes.

¶ 110. There are, of course, theorists who contend that substantive due process sweepingly protects a person's freedom of choice in marriage, family, and procreation. For instance, Professor Carolyn S. Bratt writes that the Supreme Court "has found that the right to marry is a constitutionally protected right. That right is restricted ... by state incest statutes which impede marriage between adults by making some choices of a marriage partner illegal." Carolyn S. Bratt, *Incest Statutes and the Fundamental Right of Marriage: Is Oedipus Free to Marry?* 18 Fam.L.Q. 257 (1984).

> Because incest statutes make certain adult choices of a marriage partner illegal, they are direct, substantial, and intentional state intrusions upon the individual's constitutionally protected right to marry. The Supreme Court's marriage cases mandate close scrutiny of such statutes in order to determine if they serve a substan-

tial and important state interest and whether they are discriminately tailored to accomplish such a purpose.

Bratt, *supra* at 296.

¶ 111. If the state loses its ability to set orderly limits to marriage and sexual intercourse, it may be required to shift its focus to the consequences of these activities instead of the activities themselves. To illustrate, in the *Allen M.* case, the court terminated the parental rights of a woman who engaged in incest with her brother and produced a daughter. The court considered additional evidence that the mother substantially abandoned her daughter. In the future, such a case might have to be decided differently unless the state relied on grounds other than incestuous parenthood. The mother might be able to keep her child.[16]

¶ 112. Fourth, accepting the premise that Kelli B. was a "victim" and that she satisfied any test that could be devised for non-consent to incest, the State still had compelling reasons to terminate her parental rights on incestuous parenthood grounds because she evinced many disabling symptoms of post-incest syndrome. Kelli was psychologically damaged by her victimization. She had not recovered at the time the court made its decision and had a long way to go. When Monroe County authorities intervened to take custody of the children, Kelli was in a meltdown and the safety of her children was at risk. All three children were developmentally delayed and needed to participate in early childhood remedial programs.

___

[16] Suppose a minor son fathered a child with his mother. *See Sex contact with kids brings term,* Wis. St. J. B1 (Mar. 27, 2004). Would the son's status as a "victim" preclude a termination of his parental rights?

¶ 113. In circuit court, the County's corporation counsel, the children's guardian ad litem, and social worker Ann Garrity stressed that incestuous parenthood per se was *not* the basis for termination. They were concerned about the harmful fallout from incest upon Kelli and the children. At the dispositional hearing, Kelli's attorney attempted to place the blame for Kelli's instability and lack of progress on Monroe County, suggesting that the County should have done more to help her. In effect, however, counsel's questions to Ann Garrity proved the County's case:

Q Okay. And Kelli's intellectual capacity is not high functioning, is it?

A I would say not by my assessment. We don't have an IQ report as one was never completed.

Q But her education level is, in fact, her father Roger took her out of school at a very early age, didn't he?

A I believe high school, yes.

Q Now, when you first came into this . . . Kelli was quite dependent on Roger, wasn't she?

A Yes.

Q In fact, Roger pretty much did everything for her?

A Well, when we first came into the situation on this specific incident, Roger was already out of the house.

Q But [in] looking into the background of the family, looking into Kelli's background, there was a dependency by Kelli on Roger?

A Yes.

Q And . . . basically the family turned their back on her, didn't they?

A By her report, yes.

. . . .

Q So to a great extent Kelli was, after Roger was taken away, she was left without much support?

A Correct. . . .

Q And the boys were very young at the time?

A Yes.

Q Three children under the age of three?

A Right.

Q So she needed a lot of support?

A Yes.

Q And probably more support than someone older? She is young, she has been kept very isolated?

A Correct.

Q She has been kept dependent?

A Yes.

104

. . . .

Q And rather dysfunctional at that point?

A Yes.

This dialogue reinforced Ann Garrity's direct testimony and written report.

¶ 114. Turning to the boys, the children of incest face special challenges, even in the absence of genetic problems. Corporation counsel Kerry Sullivan-Flock explained to the court that "the family issues here cannot be ignored. Any family placement option is going to have that issue to deal with. The parentage of these children, the incest that happened in this family. That is a huge, huge issue for any relative placement to have to tackle." Guardian ad Litem Ellen M. Thorn added that the children had been "born into a house where they have a huge genetic question mark where we don't know what problems they will face medically. . . . They were also born into a house that was so environmentally dysfunctional that they had significant delays. . . . [The children] were noticeably unable to do the things that other children their age were . . . [W]e need to give these kids a better chance than their mother ever had."

¶ 115. The legislature was entitled to find a link between incestuous parenthood and deficiencies in the ability to raise the children of incest. When these deficiencies are serious *and clearly established by the evidence,* the state has a compelling interest to move for termination on incestuous parenthood grounds.

¶ 116. It must be emphasized that under Wisconsin's statutory scheme, a finding of unfitness does not terminate parental rights. A finding of unfitness is separate from the subsequent judicial decision to

terminate parental rights, and the court may preserve the parent's rights, despite a finding of unfitness, when they are not incompatible with the best interests of the children.

## V. VICTIMS OF CRIME AMENDMENT

¶ 117. The majority's opinion invokes Article I, Section 9m of the Wisconsin Constitution to support Kelli's position. This is not appropriate and creates a dangerous precedent for the future. *See* majority op., ¶ 41. Article I, Section 9m was designed to afford victims of crime certain privileges and protections related to the criminal justice system. These include such things as "notification of court proceedings," "the opportunity to make a statement to the court at disposition," and the right to "information about the outcome of the case." The victims of crime amendment may not be used by crime victims as a talisman to excuse wayward conduct.

¶ 118. The majority opinion overlooks the fact that Kelli's three boys are also victims of crime. "The compelling interest underlying the [termination] statute is to protect children from unfit parents." Majority op., ¶ 25.

## VI. CONCLUSION

¶ 119. This is a sad case. But, objectively, there is only one reasonable result: the termination of the mother's parental rights. The court is conflicted about this outcome, but ultimately it is struggling over means, not ends. Monroe County authorities have acted with professionalism and compassion. Incestuous parenthood per se was not the basis of their petition for termination. *See* ¶ 69, *supra.* Chastising them and

106

forcing them to start over with a new and different petition for termination if they want to protect three vulnerable children needlessly exacerbates a tragic situation.

¶ 120. The majority has permitted heartfelt sympathy for Kelli B. to displace orderly analysis. After studying the majority opinion, I do not know (1) how a person establishes that he or she is a "victim" of incest so that the state may not constitutionally apply "incestuous parenthood" as a grounds for unfitness; (2) when a person must establish that he or she is a "victim" of incest; and (3) what a compelling state interest is. In addition, I believe the majority has misused Article I, Section 9m of the Wisconsin Constitution to bolster its case. For these reasons, I respectfully dissent.

¶ 121. I am authorized to state that Justice JON P. WILCOX joins this dissent.