In re the Termination of Parental Rights to Deannia D., a Person Under the Age of 18:

Deannia D., by her Guardian ad Litem, Deanna Weiss, Appellant,

State of Wisconsin, Petitioner-Co-Appellant,

v.

Lamont D., Respondent.

Court of Appeals

*No. 2005AP945. Submitted on briefs August 30, 2005.*
*—Decided November 8, 2005.*

2005 WI App 264

(Also reported in 709 N.W.2d 879.)

On behalf of the appellant and the petitioner-co-appellant, the cause was submitted on the briefs of *Elisabeth A. Mueller*, assistant district attorney, and *Deanna Weiss* of *Legal Aid Society of Milwaukee, Inc.*, of Milwaukee.

On behalf of the respondent, the cause was submitted on the brief of *Duke J. Lehto* of Milwaukee.

Before Wedemeyer, P.J., Curley and Kessler, JJ.

¶ 1. CURLEY, J.[1]  The State of Wisconsin and the guardian ad litem for the child, Deannia D., the subject of this termination petition, appeal the trial court's order dismissing the termination of parental rights petition brought against Lamont D., the father of Deannia. The dismissal occurred after a jury found that the State failed to prove either of two grounds alleged in the petition that would have permitted a termination of Lamont's parental rights to Deannia.[2] The petition alleged both that Lamont failed to assume parental responsibility for Deannia pursuant to Wis. Stat. § 48.415(6) (2003–04),[3] and that he failed to visit or communicate with Deannia during a six-month period, resulting in her abandonment pursuant to § 48.415(1)(a)3. The State and the guardian ad litem contend that the trial court erred in denying their motions, and request that the trial court change the answer in the special verdict concerning the abandonment claim, and alternately, seek a new trial in the interest of justice on this ground. Because the record contains contradictory evidence and a key wit-

---

[1] On the court's own motion, this case was converted to a three-judge panel on July 15, 2005.

[2] A termination of parental rights proceeding is a bifurcated process. A jury determines whether the State has proved the grounds for the termination alleged in the petition, and if the State is successful, the trial court determines the appropriate disposition. *See* Wis. Stat. § 48.424.

[3] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

ness did not testify, and because it is possible the jury did not believe that the State proved the six-month period of abandonment, the trial court's refusal to change the verdict answer or to grant a new trial was not "clearly wrong." Consequently, we affirm.[4]

## I. BACKGROUND.

¶ 2. Deannia was born on February 2, 2001. At the time of her birth, her parents, Elizabeth E. and Lamont, while not married, were living together. Several months after Deannia's birth, Lamont was arrested and then imprisoned. After Lamont went to prison, Deannia remained in the care of her mother. Lamont last saw Deannia while he was incarcerated at the Milwaukee County Jail in September 2001. Lamont, who was subsequently transferred to the Prairie Du Chien Correctional Facility and then to the Green Bay Correctional Facility, testified that while he was incarcerated, he wrote letters to both Deannia and Elizabeth, all of which he sent to Elizabeth. Due to Elizabeth's drug and mental health problems, Deannia

---

[4] Lamont argues that this court does not have jurisdiction over this matter because the guardian ad litem filed the notice of appeal and the State simply joined in the appeal instead of the other way around. We reject Lamont's contention. WISCONSIN STAT. § 48.235(7) plainly states that the guardian ad litem "may appeal, may participate in an appeal or may do neither." This clearly authorizes the guardian ad litem to file a notice of appeal. When the guardian ad litem has appealed, the State is obligated to participate as a representative of the public interest in certain circumstances. Lamont has not provided, nor can we find, anything which requires the State to file a separate notice of appeal, when the guardian ad litem has already done so, and the State's interests are aligned with those of the guardian ad litem.

was removed from her care in July 2002, and placed in foster care. At first, Elizabeth visited Deannia; however, Elizabeth began to miss many of her scheduled visits and her last actual contact with Deannia was on December 10, 2002, after which the visits were suspended. While at some point in time Lamont learned that Deannia had been placed in foster care, he testified he never received any information from the social worker concerning Deannia's detention hearing. Implicit from his testimony is his belief that Elizabeth continued to visit Deannia after she lost custody, and that Elizabeth was communicating the contents of his letters to Deannia when she visited her, even though none of his letters explicitly requested that she do so. Once released, on April 29, 2003, Lamont testified that he contacted Deannia's social worker seeking visitation with Deannia. On June 4, 2003, Lamont met with the social worker in person and testified that the social worker told him he could not visit his daughter until he completed an alcohol and drug assessment and an anger management class. Much of Lamont's account of what occurred was disputed by the State's witnesses.

¶ 3.    Shortly thereafter, on June 20, 2003, the State filed a petition seeking to terminate the parental rights of both Elizabeth and Lamont to Deannia on grounds of failure to assume parental responsibility and abandonment. After several mistrials were declared and after Elizabeth agreed that grounds existed to terminate her parental rights to Deannia, a jury determined that grounds did not exist to terminate Lamont's parental rights on either ground alleged by the State.

¶ 4.    At trial, Lamont testified that he had a substantial parental relationship with Deannia before he was incarcerated, as he was living with her mother when she was born, and purchased things for her. He

also stated he accompanied Elizabeth to several of her doctor appointments related to her pregnancy with Deannia. He told the jury that he wrote letters to Deannia and Elizabeth daily. When he was in solitary confinement, which he termed "the hole," he was not allowed the use of a pen, so he had someone else address envelopes and sent them blank cards instead. He stated that while incarcerated, he never contacted the Children's Court or the social worker, both because he was prevented from doing so by being in solitary confinement, and because he did not know who to contact.

¶ 5. One of Deannia's foster mothers, and several paid workers who supervised Elizabeth's visits with Deannia, testified that while supervising the visits, they never saw her with any letters or correspondence from Lamont. Elizabeth did not testify. The supervising social worker also disputed Lamont's version. She claimed she faxed the notice of Deannia's detention hearing to him in prison, and recalled that she gave him her business card, containing her name and contact information, while at a court appearance for another child in December 2003, and that she initiated contact with Lamont after his release. Additionally, the State and the guardian ad litem suggested to the jury that the language and content of the letters sent by Lamont were inappropriate for a child of Deannia's age.

¶ 6. On the first ground, the jury found that Lamont did not fail to assume parental responsibility for Deannia. On the second ground, the jury found that Lamont had left Deannia with another person and he either knew or could have discovered his daughter's whereabouts. Having made those two findings, the jury then found that Lamont did not fail to visit or communicate with Deannia for a period of six months or longer.

491

Because of these answers, the jury was not required to answer the remaining verdict questions, which meant that the jury found that Lamont had not abandoned Deannia. While there were two dissenting jurors to the question inquiring about the first ground to terminate Lamont's parental rights, the jury's answers concerning the second ground were unanimous.

¶ 7. Following the jury verdict, both the State and the guardian ad litem, in separate motions, sought to have the trial court change the answer to the question concerning whether Lamont failed to visit or communicate with Deannia, and, in the alternative, sought a new trial in the interest of justice. The trial court denied both motions and dismissed the petition for the termination of Lamont's parental rights to Deannia. The State and the guardian ad litem have jointly appealed this decision.

## II. ANALYSIS.

¶ 8. The State and the guardian ad litem argue that the trial court erred in denying their motions seeking either a change in the jury's answer to the question whether Lamont failed to visit or communicate with Deannia for six months or longer, and in denying their motions seeking a new trial in the interest of justice. They point to the fact that Lamont had no face-to-face visits or telephone contact with Deannia after September 2001, and that the social worker assigned to Deannia's case during the alleged abandonment period received no communication from Lamont after she sent him paperwork concerning Deannia's detention. Further, they point to the testimony of the social worker who said that Lamont did not contact her, despite her requests that he do so, until after he was released. The social worker also claimed that Lamont

made no requests to visit Deannia until their June 4, 2003 meeting, despite her sending him correspondence concerning Deannia. From these facts, they argue that since Elizabeth had no contact with Deannia after December 10, 2002, until the filing of the termination of parental rights petition, Lamont therefore could not communicate with Deannia via Elizabeth. They also complain that Lamont's various letters and cards introduced at trial, which he testified he wrote and sent to Elizabeth with the intention that Elizabeth would read them to Deannia, contained bad language and threats, and were unsuitable communications for a child.

¶ 9.　We give significant deference to jury verdicts on appeal, and may not overturn them "if there is any credible evidence" that supports what the jury has found, giving to the jury's finding every reasonable supporting inference. *State v. Quinsanna D.*, 2002 WI App 318, ¶ 30, 259 Wis. 2d 429, 655 N.W.2d 752. Stated differently, the standard of review on a sufficiency of evidence claim is that this court will not overturn a verdict if there is any credible evidence that under any reasonable view will sustain the jury's finding. *Coryell v. Conn*, 88 Wis. 2d 310, 315, 276 N.W.2d 723 (1979). When there is any credible evidence to support a jury's verdict, "even though it be contradicted and the contradictory evidence be stronger and more convincing, nevertheless the verdict . . . must stand." *Weiss v. United Fire & Cas. Co.*, 197 Wis. 2d 365, 389–90, 541 N.W.2d 753 (1995) (citation and internal quotations omitted).

¶ 10.　An appellate court should not overturn a trial court's decision to dismiss for insufficient evidence unless the record reveals that the circuit court was

"clearly wrong." *Helmbrecht v. St. Paul Ins. Co.*, 122 Wis. 2d 94, 110, 362 N.W.2d 118 (1985) (citation omitted); *see also Olfe v. Gordon*, 93 Wis. 2d 173, 185–86, 286 N.W.2d 573 (1980); *James v. Heintz*, 165 Wis. 2d 572, 577, 478 N.W.2d 31 (Ct. App. 1991). Because a trial court is better positioned to decide the weight and relevancy of the testimony, an appellate court "must also give substantial deference to the trial court's better ability to assess the evidence." *Weiss*, 197 Wis. 2d at 388–89 (citation omitted).

¶ 11. With regard to the State's and the guardian ad litem's request for a new trial in the interest of justice, under WIS. STAT. § 805.15(1), a trial court may set aside a jury verdict and order a new trial in the interest of justice. We accord "great deference" to the trial court's exercise of discretion under this subsection. *Sievert v. American Fam. Mut. Ins. Co.*, 180 Wis. 2d 426, 431, 509 N.W.2d 75 (Ct. App. 1993), *aff'd*, 190 Wis. 2d 623, 528 N.W.2d 413 (1995). We apply great deference "because the order is itself discretionary, and the trial court is in the best position to observe and evaluate the evidence." *Id.* This "interest of justice" standard encompasses the same grounds as contained in WIS. STAT. § 752.35, including the authority to reverse when errors have prevented the real controversy from being fully tried. *State v. Harp*, 161 Wis. 2d 773, 779, 469 N.W.2d 210 (Ct. App. 1991).

¶ 12. Here, the jury was instructed that the State had the burden of proving all questions to a reasonable certainty:

> Burden of proof. The burden of proof as to all questions in the verdict forms is upon the petitioner, State of Wisconsin. The burden of proof is to satisfy you

494

to a reasonable certainty by evidence that is clear, satisfactory, and convincing that "yes" should be the answer to each question in the verdicts. Clear, satisfactory, and convincing evidence is evidence which, when weighed against evidence opposed to it, clearly has more convincing power. It is evidence which satisfies and convinces you that "yes" should be the answer because of its greater weight and more convincing power.

This burden is known as the middle burden. The evidence required to meet this burden of proof must be greater than merely the greater weight of the credible evidence but less than beyond a reasonable doubt. If you have to guess what the answer should be after discussing all of the evidence which relates to a particular question, then the party having the burden of proof as to that question has not met the required burden.

Additionally, the jury was told, with respect to question three – the answer to which the guardian ad litem and the State wish changed:

Before Question 3 may be answered "yes," the petitioner must prove that Lamont . . . failed to visit or communicate with Deannia . . . for a period of six months or longer. This means that Lamont . . . did not visit and did not communicate with Deannia . . . for six months or longer.

Incidental contact between Lamont . . . and Deannia . . . does not prohibit you from finding that he failed to visit or communicate for the required period. Incidental contact means insignificant contact or contact which occurred merely by chance.

In calculating the period during which visitation did not occur, you should not include any periods during which Lamont . . . was prohibited by a judicial order from visiting with Deannia . . . .

495

¶ 13. Two possible scenarios support the trial court's decision. The first is the combination of contradictory evidence, plus the absence at trial of the testimony of Elizabeth, a key witness to the crucial events. As a result, the jury may have concluded that the State failed to meet its burden of proof. Lamont testified that when he was incarcerated, Deannia was living with Elizabeth, and claimed he did not know that Deannia had been taken from Elizabeth until some weeks after the fact when Elizabeth wrote and told him. It is clear from his testimony that Lamont assumed that Elizabeth was visiting Deannia after she lost custody of Deannia, inasmuch as he continued writing to Elizabeth and inquiring about Deannia's welfare, as well as communicating certain thoughts and beliefs he wanted directed at Deannia. Lamont testified that while in prison he received no paperwork concerning Deannia's detention. This is contrary to the social worker's testimony that she faxed the paperwork notifying him of Deannia's detention to the prison where he was incarcerated. When asked why he did not contact the court, he said he spent most of his time in solitary confinement, where he was not permitted to use a pen. He also explained that he did not know any person, other than Elizabeth, to whom he could have written who might have had contact with Deannia. He said he was unaware of the names and addresses of the foster parents and of Deannia's social worker. He testified that his appearance in court in December 2002 was for another child, and that while there he never spoke to the social worker who was also assigned to Deannia's case. Again, this is contrary to the social worker's testimony, according to which she handed Lamont her business card containing her name, address and telephone number at

the December 2002 hearing, and that she sent him paperwork after Deannia's detention.

¶ 14.   The jury also heard that although Lamont's reading and writing skills were poor, indeed, he was eligible for social security benefits because of a learning disability, while in prison, he did manage to write and send letters and cards to Deannia and her mother every day except Sunday. He explained that the language he used in his letters, which the State and the guardian ad litem claimed was inappropriate, was the only language he knew, as he was incapable of looking up words in the dictionary.

¶ 15.   There is no dispute that Lamont attempted to communicate with his daughter by writing her and her mother many letters, in which he asked how Deannia was doing and "talked" to Deannia. Given the young age of his daughter, it would have been impossible for him to write to her directly and expect her to retrieve the letters and read them herself. Clearly, he was dependent on third parties for his communications to reach his daughter. One of the major issues in this case is whether any of Lamont's attempts were successful.

¶ 16.   The State and the guardian ad litem maintain that there were no communications made on behalf of Lamont via Elizabeth. They point to the testimony of the foster mother and two workers who supervised Elizabeth's visits, all of whom claimed Elizabeth never brought any letters to her visits, and could not recall Elizabeth ever discussing Lamont with Deannia. However, since Elizabeth did not testify, the jury never had the benefit of hearing exactly what Elizabeth communicated to Deannia up until December 10, 2002, the beginning of the six-month period of abandonment alleged by the State. The jury could reasonably have

inferred that Elizabeth talked and communicated to Deannia about Lamont's love and concern, particularly since Elizabeth and Lamont remained on good terms after his incarceration, and Elizabeth received numerous cards and letters from Lamont, in which he asked about and wrote to Deannia. The jury had been instructed that if they had to guess what an answer to a verdict question should be, then the party with the burden of proof did not meet the required burden. If the jury was dissatisfied with the evidence submitted to show a lack of communication by Elizabeth with Deannia on Lamont's behalf, or felt the question required them to guess at the answer, it was entitled to answer "no," the question of whether Lamont failed to communicate with Deannia.

¶ 17. There is another possibility that supports the jury's verdict. It deals with Lamont's contact with the social worker following his release. The social worker claimed she had to contact Lamont's mother to obtain his address. Lamont testified that he called the social worker two days after his release after getting her number from Elizabeth. He admitted that he missed at least one appointment, but referenced the June 4, 2003, meeting, and although he could not recall the exact date, he testified that he met with the social worker at her office and asked her if he could visit with his daughter. He told the jury that his request was denied because the social worker wanted him to complete an alcohol and drug assessment and to attend anger management classes before any visits would be scheduled. If the jury determined that Lamont communicated with Deannia via Elizabeth, and that on June 4, 2003, Lamont asked for visitation but was prevented from doing so by the social worker, by virtue of the detention order, the jury could properly answer question three —

"[d]id Lamont . . . fail to visit or communicate with Deannia . . . for a period of six months or longer?" — "no," as they were instructed that:

> In calculating the period during which visitation did not occur, you should not include any periods during which Lamont . . . was prohibited by a judicial order from visiting with Deannia . . . .

Inasmuch as the social worker had the power, under the detention order, to prevent visitation, this period would not be included in the six months, and the State would then fall short of the six-month minimum time period needed to prove abandonment. The trial court heard all of this testimony and evaluated the credibility of the witnesses. The trial court, while not specifically delineating what evidence it took into account, determined that credible evidence for the jury's verdict existed, and reasoned that the jury could properly come to the decision it did.

¶ 18.   Thus, the trial court, as well as the jury, either found the State's witnesses' testimonies unpersuasive or insufficient, requiring them to guess at answers, or found that the State failed to prove the six-month period, as they believed Elizabeth communicated with the child on Lamont's behalf as late as December 10, 2002, and Lamont was denied visitation on June 4, 2003. In either event, the trial court concluded that the jury verdict should stand.

¶ 19.   We are not oblivious to the many contradictions in Lamont's testimony, and we observe that the jury's verdict might not have been our verdict. However, the first step in a termination of parental rights proceeding is the fact-finding hearing "to determine whether grounds exist for the termination of parental

rights . . . ." WIS. STAT. § 48.424(1). "During this step, the parent's rights are paramount." *Sheboygan County DHHS v. Julie A.B.*, 2002 WI 95, ¶ 24, 255 Wis. 2d 170, 648 N.W.2d 402 (citation omitted). "During this step, the burden is on the government, and the parent enjoys a full complement of procedural rights." *Id.*

¶ 20.  In reaching our conclusion that the trial court's holding should be affirmed, we note that the consequences of termination are profound, *id.*, ¶ 23, as " '[t]ermination of parental rights' means that, pursuant to a court order, all rights, powers, privileges, immunities, duties and obligations existing between parent and child are permanently severed," WIS. STAT. § 48.40(2). Additionally, "[b]ecause termination of parental rights interferes with a fundamental liberty interest, we apply strict scrutiny and require the state to show that termination is narrowly tailored to serve a compelling state interest." *Monroe County DHS v. Kelli B.*, 2003 WI App 88, ¶ 8, 263 Wis. 2d 413, 662 N.W.2d 360, *aff'd,* 2004 WI 48, 271 Wis. 2d 51, 678 N.W.2d 831. As required, we give the trial court's decision substantial deference and conclude the trial court was not "clearly wrong" in refusing the State's and the guardian ad litem's requests. *See Helmbrecht*, 122 Wis. 2d at 110. Therefore, we affirm.

*By the Court.*—Order affirmed.

¶ 21.  WEDEMEYER, P.J.  (*dissenting*).  I disagree with the conclusion reached by the majority for the reasons that follow. Here, the evidence, even viewed in a light most favorable to Lamont, reveals the following. Lamont admitted that he did not have any visits with Deannia from September 2001, through the time the petition was filed in June 2003. Thus, it is undis-

puted that the answer to the first part of the special verdict question specifically addressing "visits" could not have been answered "No." The remaining issue then, is whether there is *any credible* evidence from which the jury could conclude that Lamont actually *communicated* with Deannia.

¶ 22. Lamont admits that he did not communicate directly with Deannia. He did not speak with her on the phone and all of the letters/cards he wrote were sent to Elizabeth, with the intent that Elizabeth would read them to Deannia. The record demonstrates, however, that as of July 2002, Deannia did not reside with Elizabeth. Thus, between July 2002, and June 20, 2003, Lamont's "communications" were not sent to Deannia or a person who had custody of Deannia. Lamont admitted that he was informed of the fact that Deannia was removed from Elizabeth's home. He changed his story repeatedly as to when he was informed of her removal. The record unequivocally reveals, nonetheless, that, at the latest, he was notified in August or September 2002, that Deannia was removed from Elizabeth's home.

¶ 23. Lamont argues that despite the child's removal, Elizabeth could have shared the letters/cards with Deannia during supervised visits. The record, however, conclusively refutes this contention. First, the social worker who attended the supervised visits testified that Deannia never mentioned Lamont, his letters, or his queries about Deannia. The social worker testified that she would be required to make copies of any letters or cards that Elizabeth read to, or shared with, Deannia. No copies were ever made. Second, the record reflects that December 10, 2002, was the last time Elizabeth had a visit with Deannia.

¶ 24. Accordingly, the record conclusively establishes that there could not have been any communication with Deannia, through Elizabeth, via the letters from December 10, 2002, until June 17, 2003, because Elizabeth did not have any contact with Deannia. This period of time satisfies the six-month abandonment period within the statute. Based on the foregoing, there is no credible evidence to support the jury's negative answer to special verdict question number three. Therefore, the trial court erred in denying the State's motion seeking to change the answer.

¶ 25. Lamont testified that he intended for Elizabeth to read the letters to Deannia. That intent, however, is insufficient to demonstrate actual contact between parent and child. It would result in an absurdity for this court to rule that a parent's intentions about communication, instead of what actually happened, were sufficient. A parent could write to any friend or relative who had no contact with the child, with the intent that the communication would be passed on to the child.

¶ 26. Attempts to communicate by the parent and a parent's intentions can be used by the jury in answering subsequent questions on the verdict, including whether a parent demonstrated good cause for the failure to communicate. In other words, Lamont could use the letters and his intentions to show that although he did not have any contact with Deannia, he tried to have contact and Elizabeth was unable or unwilling to convey his communication to Deannia. The jury in this case, however, did not proceed to answer the remaining questions on the verdict as to whether Lamont had good cause for abandoning Deannia. I would reverse and remand this case with directions to the trial court to change the answer to special verdict question num-

ber three from "No" to "Yes" and for determination of the remaining special verdict questions, which address the issue of good cause.

¶ 27.   For these reasons, I respectfully dissent.